WILLIAM A. DENHOLM & others, executors, *vs.* MARGARET M. McKAY & others.

Worcester.    October 5, 1888. — January 14, 1889.

Present: MORTON, C. J., FIELD, DEVENS, W. ALLEN, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Will — Partnership — Executors — Accounting — Sale to Surviving Partner — Laches.*

A partnership agreement between two provided "that, if either partner shall die during the continuance of this agreement, the other party shall carry on the business in the same manner, until the next stock-taking, and the survivor shall

then have the option of taking the assets himself, at such price and terms as may be agreed upon by the legal representatives of the deceased and himself." Upon the death of one partner, his executors, one of whom was the surviving partner, as such, made a final agreement, after such a stock-taking with the surviving partner, as to the price and terms upon which he might buy the firm assets belonging to the estate. *Held*, that such agreement might be avoided within a reasonable time by those interested in the estate.

The parties interested in the deceased partner's estate were his widow and his minor children, of whom she was the guardian, and it was *held* that such children were not affected by conduct and delay on her part showing such acquiescence as might bar her personally from holding the executors responsible for selling such share for less than its value, but that it was their right, under the Pub. Sts. c. 144, § 9, to have the accounts of the executors opened to correct any errors therein.

The executors believed that they had a right to make such an agreement, and received and accounted for such assets at a price which they thought reasonable, but which was somewhat below their real value, which price was paid them by such surviving partner, who thereupon formed with new partners another firm which purchased such assets, mingled them with new assets, and sold them. *Held*, that it would not be practicable, even if just, to follow specifically the small interest of the deceased partner that was unpaid for, and ascertain how much it had earned in the new business, but that the executors should account for the full value of the share of the testator at the time of the stock-taking, with interest.

APPEAL, by Margaret M. McKay and her two minor children, who were respectively eight and ten years old, from a decree of the Probate Court allowing the third account of William A. Denholm, Robert J. McKay, and Daniel G. McKay, the executors of the will of William C. McKay, the husband and father of the appellants. Hearing before *Knowlton*, J., who reported the case for the consideration of the full court as follows.

The only question raised at the hearing was how much the executors should be charged on account of the interest of the testator in the partnership of Denholm and McKay, composed of William A. Denholm, the first named executor, and the testator. The agreement of copartnership, which was in writing, signed by them, and dated February 3, 1880, provided, among other things, that they should be equal partners in a dry goods business to be carried on at Worcester; that their copartnership should continue for three years; and that accounts of stock should be taken in February and August of each year; and contained the following provision: " And it is further agreed, that, if either partner shall die during the continuance of this agreement, the other party shall carry on the business in the same manner until next stock-taking, and the survivor shall

then have the option of taking the assets himself, at such price and terms as may be agreed upon by the legal representatives of the deceased and himself, or put the business into liquidation for the benefit of both parties, such liquidation to be as speedy as possible; or if agreed upon by the survivor and the representatives of the deceased, the business may be carried on until the expiration of this agreement; provided always that the party so carrying on the business shall at all times disclose his acts, the affairs of the firm, the books, and the account of stock, to the representatives of the party so deceased."

After the expiration of the three years named in the original articles, the copartnership was continued upon the same terms, under an oral agreement, unlimited as to time.

At the time this agreement was executed, the testator had made and had in his possession a will, in which Denholm was named as sole executor; subsequently this will was revoked by another, in which Denholm was appointed sole executor again, and this will also was revoked by that under which the appellees were appointed, which was made a few weeks before the testator's death. The testator died on May 7, 1884. The will, which was duly admitted to probate and which named the appellees as executors, after gifts to Margaret M. McKay, his wife, and others, and making provision for the maintenance and education of his two minor children, provided that the residue of his estate should be allowed to accumulate, and be given equally to such children, or the survivor, upon becoming twenty-five years old. ' Margaret M. McKay was at the time of the probate of the will guardian of such children.

In accordance with the partnership agreement, Denholm continued the business until August 27, following the testator's death, when he caused an inventory to be taken of the assets of the late firm. This inventory was taken by his clerks, the heads of the departments in the store, and they were directed to be particular about it, because it would affect the interest of the testator's estate. In doubtful matters they consulted him in regard to the values to be put upon the goods, and were guided by his suggestions.

Denholm then contemplated buying the interest of the testator's estate in the property. After this inventory had been

completed, appraisers were appointed by the Probate Court, one of whom was a man thoroughly competent to appraise dry goods, another was a corset manufacturer, and the third was engaged in the manufacture of looms, and was familiar with book-keeping and matters of account. They took the stock sheets, compared them with the property, became convinced that the inventory of that portion of the testator's estate was fairly taken, and adopted it as a part of the inventory which was filed in the Probate Court on September 16, 1884, in which inventory such portion appeared as a single item, as follows: " Mdse. $81,632.94." The executors then assumed to sell to Denholm all their right, title, and interest in the partnership property for that sum, by a contract in writing signed by them, dated September 8, 1884. On September 19, 1884, Denholm, Robert J. McKay, and one Hughes formed a copartnership, under the name of Denholm and McKay, for the purpose of continuing the business which had been formerly carried on by the old firm of that name, and Denholm assumed to turn over to the new firm the interest of the estate in the property of the old firm. This property was mingled with other property purchased by the new firm, and the greater part, if not all of it, had been sold in the regular course of the business, which was still carried on.

The judge found, for the purpose only of presenting the questions of law arising upon the report, that Denholm and the other executors intended to act fairly in relation to the taking of the inventory and the disposition of the property; that they thought the price named in the inventory was a reasonable price at which to sell; that the share of the estate was worth a little more than the sum at which it was appraised; and that unintentionally and unconsciously Denholm was influenced in his judgment by his personal interest.

In September, 1884, Margaret M. McKay had an interview with Denholm in relation to the inventory and the affairs of her husband's estate, and there was contradictory evidence upon the question whether the contract of sale of September 8, 1884, signed by the executors, was then shown her. The judge was not satisfied that she saw the writing, or knew the terms of the agreement, until after the account in question was filed, but found

that she was informed of the result of the taking of the inventory, and that she understood it was arranged by the executors that Denholm should take the partnership property and dispose of it as his own, in connection with his business, and should allow the estate for it the price at which it was inventoried, and that the executors' accounts should be settled upon that basis; and that while she indicated some disappointment that her husband's entire estate inventoried less than she expected it would, she expressed confidence in Denholm, and made no objection to the proposed method of disposing of the partnership property.

In May, 1885, Margaret M. McKay, in company with her counsel, had another interview with Denholm at his store, and heard his statements, and examined his books and papers showing the condition of the partnership affairs, so far as she or her counsel desired, and was advised by her counsel that everything seemed to have been properly done, and nothing was said in particular reference to the disposition of the property, or the manner in which it should be accounted for.

On June 16, 1885, the executors filed their first account in the Probate Court, and a citation, a copy of which was sent to her, was issued to all persons interested to appear and show cause why it should not be allowed, and the account was allowed without objection. In this account the executors were charged with the personal estate according to the inventory, and a balance was shown as remaining in their hands. Their second account was filed on June 15, 1886, the first item in which was a charge against the executors of the balance of the former account. This was sent to her by mail, for an indorsement upon it of her approval. She returned it, with a request upon it that it should be allowed without further notice, signed with her own name, and with her signature as guardian of each of her children. It was then allowed by the Probate Court, after the appointment of a guardian *ad litem*, who certified his assent to the allowance of it.

The account in question was filed on October 3, 1887, and in it the executors are charged with the balance of the former account. Margaret M. appeared and objected to the allowance of it, on the ground that the executors had not properly accounted for the partnership property.

From September, 1884, she knew that the property was being sold by the new firm of Denholm and McKay, under the belief by the executors and by the members of that firm that it was to be accounted for by the executors at the inventory price, and she believed that they were not keeping it, or the proceeds of it, separate from other property in their hands. No deception was intentionally practised upon her by either of the executors or of the members of the firm. She had no knowledge in relation to the inventory, or the particulars of the value of the property, except what she derived from Denholm.

The executors contended that they were chargeable with the partnership interest only at the price at which it was inventoried. The appellants contended that the executors should be ordered to disclose what use was made of the firm property from August 27, 1884, to the date of filing the account in question, and what profits had been derived therefrom, and that they should be charged with the value of the testator's interest in the business, and with the profits thereof. If the executors were right, the decree was to be affirmed ; otherwise, the case was to be referred to a master, or such other order made as justice and equity might require.

The case was argued at the bar in October, 1888, and afterwards was submitted on the briefs to all the judges.

*W. W. Rice & H. W. King*, for the executors.

*R. Stone*, for the appellants.

C. ALLEN, J. The appeal is taken by the widow and minor children of William C. McKay; but it is apparent upon an examination of the will that it is the children who are chiefly, if not solely, interested.

The first question to be determined is whether, in view of the fact that the surviving partner was one of the executors of the deceased partner, the contract of partnership by its true construction authorized the executors, as the legal representatives of the deceased, to make a final agreement with the surviving partner as to the price and terms upon which he should be at liberty to take the partnership assets. In the opinion of a majority of the court, the contract should not receive this construction. Three modes are mentioned for the adjustment of the partnership affairs, in case of the death of a partner. 1. The

survivor shall have the option of taking the assets himself, at such price and terms as may be agreed upon by the legal representatives of the deceased and himself. 2. He may put the business into liquidation for the benefit of both parties. 3. If agreed upon by the survivor and the representatives of the deceased, the business may be carried on until the expiration of the agreement, provided always that the party so carrying it on shall at all times disclose his acts, the affairs of the firm, the books, and the account of stock to the representatives of the party so deceased. By these provisions an intention is shown to preserve and realize in full the interest of the deceased partner, and not to give an option to the survivor to sacrifice it. If Denholm, the surviving partner, had been the sole executor, the agreement would not have the effect of allowing him to take the assets at a price fixed by himself alone; and it makes no difference in this respect that others are joined with him as executors. The transaction contemplated in the method first specified was virtually a sale, and the relation between the legal representatives of the deceased and the surviving partner was virtually that of vendor and purchaser. Although in point of fact by successive wills McKay appointed Denholm either sole or associate executor, the agreement must still be held to call for the existence of executors who should be able to act with sole reference to the interests of the estate, and independently of the interest of the surviving partner; and Denholm could not properly act on both sides of the same transaction, although there were two other executors. *Whichcote* v. *Lawrence*, 3 Ves. 740. *Morse* v. *Royal*, 12 Ves. 355, 374. *Boynton* v. *Brastow*, 53 Maine, 362.

It does not necessarily follow from this, that the surviving partner would not be entitled under the agreement to take the assets at a fair valuation. Although it is sometimes declared that, if the mode of arriving at a valuation of a deceased partner's share which is provided in the articles of agreement cannot be strictly carried out, the whole thing fails, and a settlement must be made independently of the agreement, yet it is said in 2 Lindl. Part. (4th ed.) 850, that the above rule must be taken with considerable qualification. See *Simmons* v. *Leonard*, 3 Hare, 581; *Dinham* v. *Bradford*, L. R. 5 Ch. 519. The great object of this provision in the agreement apparently was to

avoid the necessity of putting the business into liquidation by a sale, and thus of stopping the whole concern. Of course the executors, if competent to act in the matter, might sell the assets to the surviving partner, provided they could agree on the price and terms. There was no need of a special provision in the contract to say that. It seems reasonable to suppose that the parties meant to give to the surviving partner an option of taking the assets himself, as an independent right; and in the event of his electing to take them, the price and terms were to be agreed upon. But the mode of ascertaining the value is not necessarily of the essence of the contract; and it was said by Lord Hatherley, in *Dinham* v. *Bradford*, above cited, where the prescribed mode of arriving at a valuation could not be carried out, " If the valuation cannot be made *modo et forma*, the court will substitute itself for the arbitrators. It is not the very essence and substance of the contract."

But however this may be, and whether the contract should be deemed to be thus severable or not, since the executors assumed without due authority to fix the price at which Denholm might take the partnership assets, their agreement as to the price was not final, but might be avoided by those interested in the estate of McKay within a reasonable time. But such a transaction, though avoidable, will stand, unless within a reasonable time steps are taken to avoid it. This rule is of general application, whenever a sale is made by any one occupying a position of trust, if he is also interested directly or indirectly as purchaser. *Jones* v. *Dexter*, 130 Mass. 380, 383. *Morse* v. *Hill*, 136 Mass. 60, 65. *Learned* v. *Foster*, 117 Mass. 365. *Ives* v. *Ashley*, 97 Mass. 198. *Yeackel* v. *Litchfield*, 13 Allen, 417. *Wyman* v. *Hooper*, 2 Gray, 141. *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587. Lewin on Trusts, (7th ed.) 448.

Two questions remain. One is, whether there has been any such delay or acquiescence on the part of the appellants as to cut them off from their right to hold the executors thus responsible. It is contended that the facts show such acquiescence on the part of the mother, and that, as she was guardian of the children, they also are bound thereby. The discussion of this question by counsel has been but slight. The rights of infants are sedulously protected by courts of law and of equity, as well

as by statute. Illustrations of this may be found in the limited power of guardians to bind their infant wards by express contract: *Oliver* v. *Houdlet*, 13 Mass. 237; *Massachusetts General Hospital* v. *Fairbanks*, 132 Mass. 414, 421; *Rollins* v. *Marsh*, 128 Mass. 116; *Thacher* v. *Dinsmore*, 5 Mass. 299; in the statutes of limitation, which do not run against infants: Pub. Sts. c. 196, § 5; c. 197, § 9; in the doctrine of estoppel, which ordinarily is not applicable to infants or other persons incapable of contracting for themselves: *Pells* v. *Webquish*, 129 Mass. 469, 472; *Merriam* v. *Boston, Clinton & Fitchburg Railroad*, 117 Mass. 241, 244; *Pierce* v. *Chace*, 108 Mass. 254, 258; *Bemis* v. *Call*, 10 Allen, 512; *Lowell* v. *Daniels*, 2 Gray, 161; and in the rules of practice in courts of equity, as to the effect of answers by guardians: *Mills* v. *Dennis*, 3 Johns. Ch. 367; *James* v. *James*, 4 Paige, 115, 119; *Stephenson* v. *Stephenson*, 6 Paige, 353; *Tucker* v. *Bean*, 65 Maine, 352; *Turner* v. *Jenkins*, 79 Ill. 228, 232; *Berrett* v. *Oliver*, 7 Gill & J. 191; *Holden* v. *Hearn*, 1 Beav. 445, 455; 2 Kent Com. (12th ed.) 245; 1 Dan. Ch. Pract. (5th ed.) 169. The practice in Massachusetts is shown in *Walsh* v. *Walsh*, 116 Mass. 377. The assent of a guardian *ad litem* of a minor *cestui que trust* to an account rendered by a trustee, is no bar to a revision and correction of the account when reopened. *Blake* v. *Pegram*, 101 Mass. 592. The court say, " The fact that a guardian *ad litem* was appointed in order to give validity to the former decree does not protect the accounts from revision. The right to have errors corrected is recognized, even when the party interested was under no disability. And the assent of such a party to the account as settled in the Probate Court, or of a guardian *ad litem* in his behalf, does not preclude him." p. 598. The doctrine is usually declared in general terms, that laches is not to be imputed to an infant; and no exception is made of infants under guardianship. Thus in Lewin on Trusts, (7th ed.) 449, it is said, " Persons not *sui juris*, as femes covert and infants, cannot be precluded from relief on the ground of acquiescence during the continuance of the disability." See also 1 Perry on Trusts, (3d ed.) § 467; *Burns* v. *Thayer*, 115 Mass. 89; *March* v. *Russell*, 3 Myl. & Cr. 31, 44; *Blandford* v. *Marlborough*, 2 Atk. 542, 545; *Campbell* v. *Walker*, 5 Ves. 678; *Allen* v. *Sayer*, 2 Vern.

368; *Meanor* v. *Hamilton*, 27 Penn St. 137; *Piatt* v. *Smith*, 12 Ohio St. 561, 571, 572. On the whole, in view of these authorities and considerations, we are of opinion that, even if it be assumed that the conduct and delay of the mother showed such acquiescence as to bar her personally, respecting which it is unnecessary for us to give an opinion, the minor children are not affected thereby; and that under Pub. Sts. c. 144, § 9, it is their right to have the former accounts of the executors opened so far as to correct any errors therein.

It now appears that, although the executors were guilty of no actual fraud, and intended to act fairly, and thought the price fixed a reasonable one at which to sell, yet the share of the deceased was worth a little more than the sum at which it was appraised, and that unintentionally and unconsciously Denholm was influenced in his judgment by his personal interest. The children are entitled to have the executors account for the full value of the share of the deceased. If this were not so, and they were cut off by the delay and acquiescence of their mother, it would be difficult to escape from the conclusion that she herself would be responsible, in the settlement of her accounts as guardian, for any loss thereby resulting to the children. *Pierce* v. *Prescott*, 128 Mass. 140, 146, 147.

The final question is, what is the measure of the liability of the executors? If the agreement is severable, so that Denholm was entitled as of right to take the assets at a fair valuation, it follows that it is now only necessary to ascertain and fix upon such fair valuation, and substitute it for the price actually agreed upon. But the same result would also be arrived at if the whole provision which was acted on in the agreement is treated as inoperative. Each case must depend on its own circumstances. *Robinson* v. *Simmons*, 146 Mass. 167. In the present case, the executors entered into this method of adjustment, believing that they had a right to do so, and they received and have accounted for a price which they thought reasonable, but which in fact was not quite enough. New partners entered the firm. The amount of capital belonging to McKay's estate, over and above the amount accounted for, which remained in the new business, was small. It would not be practicable, even if just, to follow it specifically, and ascer-

tain how much it has earned ·in the subsequent business. What the executors ought to have accounted for was the full value of McKay's share at the time of the stock-taking; and we think it sufficient if they account for that value now, with interest, instead of the amount they actually accounted for.

The case must therefore be sent to a master to ascertain ·and report what was the fair value of the interest of the deceased in the assets and business of the partnership at the time of the stock-taking.          *Ordered accordingly.*