WILFRED TRUDEAU vs. LUCIEN POUTRE.

Bristol.    October 29, 1895. — January 1, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP,
& BARKER, JJ.

*Breach of Agreement — Substitution of Debtor — Law and Fact — Evidence —
Exceptions.*

In an action for breach of an alleged agreement that, in consideration of the
release by the plaintiff of a third person from a debt owed to the plaintiff, the
defendant would pay the plaintiff the amount of the debt in a certain manner,
if it is in dispute between the parties which of two constructions should be given
to the transaction, and there are language, circumstances, and considerations
consistent with either view, but nothing so clear as to enable this court to say
how the case should have been decided as matter of law, exceptions of the
plaintiff to the direction of a verdict for the defendant will be sustained.

At the trial of an action for breach of an alleged agreement that, in considera-
tion of the release by the plaintiff of A. from a debt owed to the former and
secured by two mortgages from A., the defendant would pay to the plaintiff the
amount of the debt, the evidence tended to show that the debt was for an inter-
est in a business sold by the plaintiff to A.; that the defendant proposed to buy
the business of A., and the plaintiff agreed to accept the defendant as his debtor
and to release A.; that the three parties went to the office of a lawyer, who
drew a bill of sale and a mortgage from the defendant to the plaintiff, and also
discharges of the A. mortgages written thereon; and that all the papers were
left with the lawyer. *Held,* that evidence that subsequently, when the plaintiff
in company with A. took the A. mortgages from the lawyer, giving a receipt
for them, A. asked the lawyer to give the mortgages to him, was admissible;
and that the question to the plaintiff, " What was the reason you took these
papers ? " should also have been admitted.

A point not taken at the trial is not open upon a bill of exceptions.

CONTRACT.   The declaration was as follows: " The plaintiff
says that on or about the second day of June last he was the
holder and owner of two certain mortgages, one given by one
Louis Picard on certain personal property then in a store No. 66
East Main Street, Fall River, the other given by Mary Picard
on certain real estate situate in said Fall River, and both said
mortgages having been given to secure the payment of two
certain notes of $1135.00, the principal of which notes amounted
to $863.20 at said date ; that on or about said date, in considera-
tion that the plaintiff release the said Louis and Mary Picard
from the said notes and debt secured by said mortgages, the

defendant agreed with the plaintiff to pay him said amount of $863.20 in the manner following, namely, $263.20 cash at that date, and also at said date $600 by note payable in weekly instalments of $10, with interest; and in consequence of said agreement on or about said second day of June last the plaintiff did release the said Louis and Mary Picard from said debt and notes, but the defendant has neglected and refused to make his payments as aforesaid, and to give his note as aforesaid, although often requested by the plaintiff so to do, to the great damage of the plaintiff." The answer contained a general denial, and also set up the statute of frauds.

Trial in the Superior Court, before *Lilley*, J., who allowed a bill of exceptions, in substance as follows.

The plaintiff, a practising physician in Fall River, formerly owned in partnership with one Louis Picard the stock and fixtures in a drug store No. 66 East Main Street in Fall River. The plaintiff sold his interest in the store to Picard, and took a note therefor from Picard, on which $863.20 was due on June 2, 1894, which was secured by a mortgage on the stock and fixtures of the drug store, and by a note and mortgage on real estate in Fall River from one Mary Picard.

The plaintiff testified that he was the defendant's family doctor; that the defendant came to him on the first day of June to consult him about some medicine, and said he wanted to buy Picard's store; that Picard wanted $1,000 for it; that it was his intention to pay Picard the balance over the mortgage, and then he would have only to deal with the plaintiff; that the next morning Picard and the defendant came together to the plaintiff's office; that Picard said he had sold the store to the defendant for $1,000, and the defendant had given him ten dollars the evening before to bind the bargain; that the defendant agreed to pay Picard the balance of the $1,000 over the amount due on the mortgage note; that he would pay the plaintiff $263.20 in cash and give a note for $600 payable in weekly instalments of ten dollars; that he would give the plaintiff a mortgage on the drug store to secure the $600 note, and also a mortgage on real estate for the same purpose; that if he did not pay the $263.20 in cash, he would give a note for it indorsed by one Murphy; that Picard asked the plaintiff to release him and

take the defendant in his place, and the plaintiff said, " Yes, by this agreement I will take Poutre in place of you " ; that after that the plaintiff, the defendant, and Picard went to the law office of Edward Higginson and asked Mr. Higginson " to pass a bill of sale " ; that Mr. Higginson " passed the bill of sale " ; that the defendant gave the plaintiff a mortgage on the drug store for the sum of $600, and a note of that amount to be paid in sums of ten dollars a week ; that, before leaving the office, the plaintiff signed discharges drawn up by Mr. Higginson on each of the mortgages which he had from Picard and his wife ; and that then the plaintiff, the defendant, and Picard left the office together, leaving all the papers there, and Picard asked the defendant for his money, which he paid.

The plaintiff further testified as follows : " I saw the defendant the second day after that, and asked him for my money, and he said, ' No, I want to wait until I get my transfer.' I told him I had nothing to do with the transfer. He kept coming about two or three days a week to my place, and almost every time I asked him for my money, and he put me always off. He was always telling me that he was waiting for the transfer that Picard promised to get for him. I told him that I had nothing to do with that ; that if Mr. Picard promised the transfer, it was none of my business. I.told him that he made me discharge Picard, and he was responsible for it."

The plaintiff also testified that he got the Picard mortgages back from Mr. Higginson twice ; that the first time he took them on a promise to Mr. Higginson to return them, showed them to his counsel, and returned them to Mr. Higginson ; and that they remained with Mr. Higginson until July 14, when he went with Picard to Mr. Higginson's, took these mortgages, and gave a receipt for them.

The plaintiff offered evidence to show that Picard at that time, the defendant not being present, but the plaintiff being present, asked Mr. Higginson to give him these mortgages, with the discharges written and signed on them. Upon the defendant's objection, the judge excluded the evidence ; and the plaintiff excepted. The plaintiff was further asked, " What was the reason you took these papers ? " which question, upon the defendant's objection, was excluded ; and the plaintiff excepted.

On cross-examination, the plaintiff testified that, after sign-ing the releases, he left them with Mr. Higginson from the day they were signed until July 14, with the single exception that the plaintiff obtained them one day to show them to his attorney and that was all he did with them on that day, and that all the papers were left with Mr. Higginson; that, on the first day when he saw the defendant, the plaintiff told him that he wanted some money, and that he wanted security for the rest; that, on the next day, when the defendant and Picard saw the plaintiff, Pic-ard asked the plaintiff if he would take the defendant to replace Picard, and the plaintiff said, " Yes, as long as I have security for my money, I don't care who will pay me "; that Picard said then, " You will discharge me and take Poutre in my place ? " and the plaintiff said, " Yes, as long as he is willing to do what he stated," and the defendant said it was all right; that the plaintiff said that he would agree to the payment by the defend-ant of $263.20, either in cash or by his note indorsed by one Murphy, and as to the balance that the defendant was to give him as security for the $600 a mortgage on his drug store and a mortgage on his real estate, and the defendant said he would give him that security; that at last the defendant said that he would rather give the plaintiff a note indorsed by Murphy for the $263.20, and the plaintiff said it was all right as long as he would be secured for his money; that Picard said, " You will discharge me and my wife ? " and the plaintiff said, " Yes, I will take Poutre to replace you, as long as Poutre will fulfil what he said now " ; and that the defendant said it was all right, that he gave his word and it was all right.

Picard testified that the defendant, about June 1, 1894, came to him to buy the drug store; that he agreed with the defendant on the price, which was to be $1,000; that the defendant gave him ten dollars to bind the bargain ; that he said to the defend-ant, " I cannot make a bargain that way, because Dr. Trudeau has a mortgage ; we will have to see him first ; I cannot make any bargain alone " ; that they agreed to see the plaintiff in the morning; that they saw him the next morning; and that he told the plaintiff, in the presence of the defendant, that he had sold his place to the defendant for $1,000.

The witness further testified as follows: " I said, ' Will you

take Poutre in my place for payment?' Poutre was there; I asked him if he wanted to take Poutre in my place and relieve me. He says, ' Any of you, as long as you pay me, will be good.' So I told the bargain to the doctor and then made the bargain in the presence of the doctor and Poutre. I told him (defendant) I wanted money — cash — for my part; it was very little, and I wanted it. He said, ' Doctor, will you take that $263.20 cash, and then so much a month?' The doctor says, ' Yes, it will be $10; pay him $263.20 cash, and $10 a month, and give him security, and it will be all right.' We went to Mr. Higginson after that; I told Mr. Higginson that I had sold my drug store to Poutre. . . . After that they made the papers. . . . When we were downstairs I said, ' Look here, I want my money.' Poutre said, ' Would there be any objection to my transfer?' I said, ' I don't see none, I am sure there will be no objection against me and my man.' He says, ' That will be all right then.' So he gave me my money."

There was no evidence other than such as herein appears of any delivery or tender by the plaintiff, or any one in his behalf, of the Picard mortgage on the stock and fixtures of the drug store with the release thereof, or of Picard's note secured thereby, to either Picard or the defendant; nor of any authority from the plaintiff to Mr. Higginson to deliver the Picard mortgage with the release thereof, or the note secured thereby, to either Picard or the defendant; nor that the defendant gave Mr. Higginson any authority to receive the Picard mortgage with the release thereof, or the note secured thereby, from the plaintiff for the defendant; nor that Picard gave Mr. Higginson any authority to receive his mortgage with the release thereof, or the note secured thereby, from the plaintiff for Picard.

At the close of the plaintiff's evidence, at the request of the defendant and against the plaintiff's objection, the judge directed the jury to return a verdict for the defendant; and the plaintiff alleged exceptions.

The case was argued at the bar in October, 1895, and afterwards was submitted on the briefs to all the judges.

*L. E. Wood,* for the plaintiff.

*J. W. Cummings,* (*E. Higginson & C. R. Cummings* with him,) for the defendant.

Morton, J. If the parties mutually agreed that the defendant should pay the plaintiff what Picard owed him, and the plaintiff accepted the defendant as his debtor in the place of Picard, and released Picard, the contract thus entered into would be valid and binding. *Wood* v. *Corcoran,* 1 Allen, 405. *Lord* v. *Davison,* 3 Allen, 131. *Caswell* v. *Fellows,* 110 Mass. 52. The release of Picard would constitute a sufficient consideration for the defendant's promise to the plaintiff. *Caswell* v. *Fellows, ubi supra.* And the promise declared on being an original undertaking and not a collateral one, and not including the giving of a mortgage by the defendant on his real estate, would not be within the statute of frauds. *Lord* v. *Davison* and *Wood* v. *Corcoran, ubi supra.* If there was no doubt as to the terms of the agreement, it would be a question of law for the court whether a substitution had been effected. *Sinclair* v. *Richardson,* 12 Vt. 33. But if the terms of the agreement were equivocal or uncertain, then it would be a question of fact for the jury, under suitable instructions. *Sinclair* v. *Richardson, ubi supra.* If the agreement of the plaintiff to release Picard and take the defendant in his place was conditional upon the defendant's giving the mortgages, or such condition formed an essential part of it, then it is clear that there was no substitution, for the mortgages were not given. But if the defendant promised to pay the debt, and the plaintiff, relying on that, released Picard, so that if the defendant did not perform his agreement the plaintiff's only remedy would be an action against him for the breach of it, then the substitution was complete, and Picard became entitled to a discharge of the mortgages which he and his wife had given to the plaintiff, the debt which they were given to secure having thus been cancelled and discharged. And it would not affect the plaintiff's right of recovery that the defendant also orally agreed to secure the plaintiff by a mortgage on his real estate. *Rand* v. *Mather,* 11 Cush. 1. *Haynes* v. *Nice,* 100 Mass. 327.

It was in dispute between the parties which of the two constructions indicated above should be given to the transaction ; the defendant contending in substance that it should be the former, and the plaintiff the latter. There is language and there are circumstances and considerations consistent with

either view; but there is nothing, we think, so clear as to enable us to say how the case should have been decided as matter of law.

The conduct of the plaintiff and his conversations with the defendant tend to show that the transaction was what he insists that it was.   The terms in which he and Picard state the agreement are also consistent with that view.   The plaintiff testified, amongst other things, "I told him [defendant] that he made me discharge Picard, and he was responsible for it" (the debt). This does not appear to have been contradicted by the defendant, and certainly would have some tendency to show that the agreement was as the plaintiff contended, and that the stipulated consideration, namely, Picard's release, had been furnished by the plaintiff.   And it might have been found, as the fair implication of the conduct and talk of the parties, that the papers were left with Mr. Higginson with authority to deliver them to Picard, and that, if leaving them with him was not enough of itself, the evidence of Picard's asking for them was evidence of an acceptance by him, and should have been admitted.

The question, "What was the reason you took these papers?" has not been argued; but it may become material upon another trial, and we think that it should have been admitted for the purpose of enabling the plaintiff to show, if he could, that he did not take them with a view to rescinding the contract.

The question of variance does not appear from the exceptions to have been raised at the trial, and cannot be raised here for the first time.

A majority of the court think that the exceptions should be sustained, and it is so ordered.

*Exceptions sustained.*