JOSEPHINE RIZZO *vs.* MARY CUNNINGHAM & another, executors.

Suffolk.     January 3, 1939. — April 12, 1939.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, & COX, JJ.

*Contract*, Construction, To make will, Implied, With minor, Consideration. *Evidence*, Of value. *Minor. Damages*, For breach of contract. *Devise and Legacy*, Whether benefaction or payment of debt.

Evidence respecting the circumstances of the making of a promise by an elderly woman to the plaintiff, a girl fifteen years of age who had been living with her for four years, in substance that, if the plaintiff would attend high school and would continue to live with her and be a companion to her, everything she had would be the plaintiff's when she was gone; that the promise was confirmed to the plaintiff four years later and admitted in conversation by the woman with a neighbor; and that the plaintiff satisfied the conditions, warranted submission to the jury of the questions, whether a contract was made and whether its meaning was that, if the plaintiff satisfied the conditions stated, the woman would leave her her property by will; and instructions were proper that, while there could be no recovery

upon such a contract, if made, there could be recovery upon a *quantum meruit* for the value of services rendered in reliance upon the woman's promise.

There was no merit in a contention that a minor girl, placed by her guardian in the household of an elderly woman, was legally bound to render services and care to the woman and that the girl could not give consideration for the woman's promise to leave her her property if she would render such services.

Testimony by a plaintiff as to the value of personal and household services rendered by him while a minor was admissible; its weight was for the jury.

In an action against an executor upon a *quantum meruit* for services rendered to the decedent by the plaintiff while a minor, the defendant was not entitled as a matter of law to have considered, "in modification" of the plaintiff's damages, a legacy to her in the decedent's will, where it did not appear that the plaintiff had accepted the legacy or that there was a statement in the will that the legacy was in payment in whole or in part of a debt to the plaintiff.

CONTRACT. Writ in the Superior Court dated June 26, 1933.

A verdict for the plaintiff in the sum of $7,000 was returned before *Hurley*, J., and he reported the case to this court.

*E. B. Cook*, (*J. N. Esdaile* with him,) for the plaintiff.

*S. Abrams*, (*E. L. Lane & H. I. Klarfeld* with him,) for the defendants.

Cox, J. This is an action of contract brought to recover for personal services alleged to have been rendered from September, 1925, to January 19, 1932, to Rose E. O'Brien, the defendants' testatrix, hereinafter referred to as Miss O'Brien. The case was tried to a jury on the second count of the plaintiff's declaration, upon a *quantum meruit* for the alleged services. The defendants pleaded, among other things, the statute of frauds. The jury returned a verdict for the plaintiff which, on leave reserved, was set aside and a verdict for the defendants entered. The trial judge reported the case to this court upon the stipulation that, if there was admissible evidence warranting the jury in returning a verdict for the plaintiff, and the case was properly submitted to the jury, then judgment is to be entered for the plaintiff on the verdict, unless there was prejudicial error in the admission or exclusion of evidence or in the

charge to the jury, in which case such order shall be made as justice may require; if this court is of the opinion that there was no evidence warranting a verdict for the plaintiff, then judgment is to be entered for the defendants.

The jury could have found that the plaintiff's parents died some time before 1921. In the fall of that year Miss O'Toole, a nurse in the school that the plaintiff attended, took her to the home of Miss O'Brien, who was then about sixty years old and lived by herself in a home that she owned. The plaintiff was then eleven years old. Miss O'Toole said to the plaintiff: "Josephine, this is your Aunt Rose, and she is going to take care of you, you are going to help around the house and do little things for her. This is going to be your home"; and Miss O'Brien said: "Josephine, you are going to be my little girl from now on. You are going to make your home with me and I am going to take care of you." At that time Miss O'Toole had been appointed guardian of the plaintiff, although the latter did not learn of this until about 1932. While the plaintiff was attending grammar school, Miss O'Brien treated her generously and purchased clothes for her. The plaintiff helped around the house when she came home from school, took care of the furnace in the winter, mowed the lawn in summer, did the dishes, and a little of the washing, dusting and cleaning, "went to the store," and "did anything a child would do." She graduated from grammar school in 1925 and in that fall, just before high school opened, Miss O'Brien said to her: "Josephine, I want you to go to High School and study hard. Go get all you can out of it. You are the only person who I have to take up my interest now. You are the only one I have got in the world now to think about, and you do as I tell you to and go to High School and be a companion to me, and come home and stay with me, some day when I am gone, everything I have got will be yours," and the plaintiff thereupon told Miss O'Brien that she "would do everything she asked her to do, and that she would stay with her." In 1925, Miss O'Brien told her next door neighbor that "she had nobody left but Josephine and she had taken this little girl into her home

to be her companion and to take care of her, and to be a companion for her, and . . . as long as Josephine would do all she wanted and be her companion and do right, she was to take care of Josephine and leave Josephine all she had." Some time in February, 1929, Miss O'Brien said to the plaintiff: "Josephine, I have sold my East Boston property, and I got $22,000 for it. That is more than enough for you and me to live on. Some day when I am gone, if you stick by me and be my companion and continue to live with me, all my money and my house I will leave to you." The plaintiff then told her, "You talk too much about dying, forget it," and said that she would always stay with her and be her companion and they would have good times together. In the fall of 1929 Miss O'Brien said to her next door neighbor, in the plaintiff's presence: "Mrs. Curran, Josephine wants to go to work and I don't want her to go to work, because Josephine is the only thing I have in the world to think of. . . . All of my relatives have gone back on me and I haven't a friend in the world but Josephine, and I have promised Josephine that if she will stay with me and be my companion, that I will give her all my money and my house for being my companion." At that time Josephine said: "Well, Miss O'Brien, I will stay with you always. I will do just as you want me to do."

The plaintiff entered high school in the fall of 1925. She did practically all of the house work, including a part of the washing, and in the summer she took care of the lawn. In the winter she cared for the furnace and the coal; did all of the shopping for Miss O'Brien and took her out in her automobile. On Saturdays she cleaned the house from "top to bottom." "In fact she did about everything about the house. She stayed at home practically every night during the time she was going to High School, and on two or three nights a week at least she read to Miss O'Brien." The plaintiff went to Boston on Saturdays with Miss O'Brien and frequently assisted in selecting her clothes. She shampooed Miss O'Brien's hair, manicured her nails, and gave her facial massages. When Miss O'Brien was sick,

the plaintiff cared for her. In February, 1931, the plaintiff entered a training school for nurses. Once a week she spent her day off with Miss O'Brien, did the work about the house and occasionally they went to Boston. In the fall of 1931 Miss O'Brien became ill, and the plaintiff returned to the home and remained there until Miss O'Brien died on January 19, 1932. During this interval Miss O'Brien said to the plaintiff: "Jo, I am old now, and I am a sick woman, and you are the only one who has been around here all these years. My relatives and none of my old friends have been around to see me. I don't think I am going to live long and I want to tell you about my property. I have about $15,-000 left, and my house, and for taking care of me as you have and if you will stick by me and take care of me until I die, when I die I am going to leave all this money and the house to you"; and the plaintiff replied: "I won't leave you and I am going to stay right here with you and take care of you."

The defendants contend that a contract cannot be made out from the conversation in 1925 between Miss O'Brien and the plaintiff; that there was no cross or redirect examination of the plaintiff as to this conversation; that the words used are not in dispute; and that the interpretation of the language used was for the judge and not for the jury. It is true that where a contract is oral, the question of what the contract is must, if controverted, be tried by a jury as a question of fact; but where the terms of a contract are undisputed, its construction and effect, where the contract is oral as well as where it is written, are to be determined by the judge. *Globe Works* v. *Wright*, 106 Mass. 207, 216. If the meaning of words used by the parties to an alleged contract is doubtful, and extrinsic evidence is resorted to, their meaning is to be found and then, in the light of such finding, the judge interprets the contract, or the case may go to the jury under instructions from the judge as to the legal result which follows from the meaning as found by the jury. *Smith* v. *Faulkner*, 12 Gray, 251, 255, 256. *Bascom* v. *Smith*, 164 Mass. 61, 76. *Trudeau* v. *Poutre*, 165 Mass. 81, 86. *Aldrich* v. *Bay State Construction Co.* 186 Mass. 489,

494. In the case of *Ellis* v. *Block,* 187 Mass. 408, where one question was whether a contract, and if a contract, what contract, was made in part by word of mouth and in part by correspondence, the court said (at page 412) "it is for the court to deal with the question which is for it in its instructions to the jury, and to leave the whole question under those instructions to the jury." *Way* v. *Greer,* 196 Mass. 237, 246, 247. Where the language is ambiguous, preliminary negotiations, the conduct of the parties, and interviews between them after the contract is executed are relevant matters and are admissible in evidence, not to vary or enlarge the agreement, but to define the meaning of the terms the parties employ. *Derby Desk Co.* v. *Conners Brothers Construction Co.* 204 Mass. 461, 470, and cases cited. *Greene* v. *Boston Safe Deposit & Trust Co.* 255 Mass. 519, 523, 524. *Bachinsky* v. *Rogers,* 273 Mass. 381. This evidence is not received for the purpose of constructing a new contract or varying the old one, *Jennings* v. *Puffer,* 203 Mass. 534, 538, but is to enable the judge to understand the subject matter of the agreement as it lay in the minds of the parties and the meaning that they themselves put upon any doubtful or ambiguous terms they may have used, and so to apply their language correctly to the subject matter which was in their contemplation. *Way* v. *Greer,* 196 Mass. 237, 246, 247. *Garfield & Proctor Coal Co.* v. *Pennsylvania Coal & Coke Co.* 199 Mass. 22, 37. Such evidence is an aid in determining the intention of the parties if the meaning of the words used is doubtful. *Smith* v. *Faulkner,* 12 Gray, 251, 255. Compare *Way* v. *Greer,* 196 Mass. 237, 245, 246.

At the close of the evidence the defendants filed a motion to require the plaintiff to elect. The defendants concede that this was a motion to "have the plaintiff elect as to what conversation was the basis of the plaintiff's claim." The judge stated to the plaintiff's counsel that he understood him to base the plaintiff's claim "on the alleged agreement of 1925, and that these agreements, which Mr. Klarfeld [one of the attorneys for the defendants] assumes were definite agreements, in February and September of 1929 were mere reiterations of the first agreement, and the

only agreement, and statements made in confirmation of it." The plaintiff's attorney said that was his position, whereupon the judge quoted from his notes as to the conversation in 1925 between Miss O'Brien and the plaintiff as the agreement upon which the plaintiff relied, and the plaintiff's attorney said "That is right." The judge then inquired: "That is your understanding?" Mr. Klarfeld replied, "That is right," and the judge said: "Well, with that assurance by counsel for the plaintiff you don't need to press your motion."

The judge left it to the jury to determine whether the conversation of 1925 "amounted to an agreement between the parties to do certain things, and what sort of an agreement it was, whether it was an agreement to make a will and leave all property to the plaintiff, or whether it was an agreement to do something else that might have been performed within a year after that particular agreement was made, or whether, in fact, there was any agreement at all." The jury was fully instructed as to what constituted a contract. The point was stressed that mere expression of intention upon the part of one party and especially upon the part of the one who is sought to be charged, would not constitute an agreement, but that there must be a meeting of the minds, and that if there was an offer there must also be an acceptance. The jury was told that if the conversation did not amount to an agreement by which Miss O'Brien was to make a will and leave all her property to the plaintiff, a verdict for the defendants should be returned, but that if it amounted to an agreement to make such a will, the plaintiff could not recover upon such an agreement, but might recover the fair value of the services performed by the plaintiff in reliance upon the promise made by Miss O'Brien, and that in order for her to recover it must be found that the plaintiff definitely relied upon that promise and performed the services in the expectation that the promise would be kept. With respect to the conversations of 1929, the jury was told that it was to consider them only as evidence upon the issue whether or not there was an agreement in 1925, whether or not those conversations

were admissions by Miss O'Brien, and whether they were in confirmation of the fact that an agreement was made in 1925.

We think there was no error in submitting the question to the jury. There was evidence of a distinct request on the part of Miss O'Brien to the plaintiff to "do as I tell you to and go to High School and be a companion to me, and come home and stay with me," and a promise that "some day when I am gone, everything I have got will be yours." In answer, the plaintiff told Miss O'Brien that she "would do everything she asked her to do, and that she would stay with her." We think, however, that Miss O'Brien's promise was ambiguous. It could have been found to mean that if in her lifetime she did not provide that everything she had would be the plaintiff's, it would be hers through the instrumentality of a will. The jury could have found from the conversation of 1925, and in the light of the subsequent conversations, that in 1925 Miss O'Brien had promised the plaintiff that if she would stay with her, she would give her all her money and her house, and that she would do this through the instrumentality of her will. We must assume that the jury, under the instructions, found that there was a contract between Miss O'Brien and the plaintiff by the terms of which an unenforceable promise to provide by a will was made and accepted; that Miss O'Brien failed to keep her promise, and that the plaintiff is entitled to recover for the fair value of the services that she rendered in reliance upon the contract. *Donovan* v. *Walsh*, 238 Mass. 356. *Dixon* v. *Lamson*, 242 Mass. 129. We think the case at bar is distinguishable from the cases of *Graham* v. *Stanton*, 177 Mass. 321, and *Hurl* v. *Merriam*, 252 Mass. 411. In the last case the court pointed out (at page 414) that the "plaintiff made no promise to care for . . . [the intestate] and to give him a home while he lived. There was no meeting of the minds," and that the case was distinguishable from *Donovan* v. *Walsh*, 238 Mass. 356, and *Dixon* v. *Lamson*, 242 Mass. 129, in each of which "there was a binding agreement between the parties, an offer made by the de-

ceased, an acceptance of its terms by the plaintiff, and full performance on the plaintiff's part."

From what has been said we think it follows that the conversation upon which the jury was permitted to find an agreement, in the light of what was said thereafter, was not too vague and indefinite to form the basis for a contract, and that the case is distinguishable from *Stewart* v. *Johnson*, 252 Mass. 287.

The defendants contend that the plaintiff, as a member of Miss O'Brien's household, and as a ward of Miss O'Toole, was in no position to furnish consideration for Miss O'Brien's promise by a counter promise to perform, for the reason that she was already legally bound to do the things which she says she promised to do. It was pointed out in *Livingston* v. *Hammond*, 162 Mass. 375, 376, that a man is not bound to maintain the children of his wife by a former marriage, but if he chooses to receive them into his family and to assume the relation of a parent to them in their daily life, the law will not imply a contract on his part to pay them for the services which they render him while members of his family, nor a contract on theirs to pay him for their maintenance, but the court said, at page 377: "Of course there may be circumstances in any case which will rebut the ordinary presumption from the residence together in the same family of persons so related, and will call for an inference that the step-father was not acting *in loco parentis*, but in a different relation." *Graham* v. *Stanton*, 177 Mass. 321, 325. *Lyons* v. *Jackson*, 232 Mass. 275. In the case of *Oliver* v. *Houdlet*, 13 Mass. 237, the general rule is stated that an infant's contract, although voidable by him, binds the party of full age, and that the authority and interest of a guardian extend only to such things as may be for the benefit and advantage of the ward; that if an infant makes a contract from which he derives a benefit it cannot be avoided by his guardian, and that the rule of the civil law is that pupils may better their interests without the authority of their tutors. See *Denholm* v. *McKay*, 148 Mass. 434, 441, 442. We think that the defendants cannot be heard to complain on the

ground that the plaintiff was not in a position to make the contract relied upon. Furthermore, it is to be noted that by the terms of that contract she might be required to render services after reaching her majority.

The defendants excepted to the refusal of the judge to strike out the plaintiff's testimony of her opinion as to the fair market value of her services from September, 1925, to the date of Miss O'Brien's death. On direct examination she gave her opinion. On cross-examination she testified that she did not "know what her services were worth in 1926 per week"; that she did not know what they were worth in 1928 or 1929; and that she had no opinion of the value of her services from February to November, 1931. On redirect examination she testified that she had an opinion of the value of her services for the period from September, 1925, to the date of Miss O'Brien's death, and she gave her opinion.

The plaintiff could testify as to the market value of her services. *Harmon* v. *Old Colony Railroad*, 168 Mass. 377, 378, 381. *Chandler* v. *Baker*, 191 Mass. 579, 584, 585. *Butler* v. *Butler*, 225 Mass. 22, 26. See *Copithorne* v. *Hardy*, 173 Mass. 400, 402. The most that can be said of the plaintiff's testimony is that it is an instance of conflicting statements and that it was for the jury to determine to what the testimony amounted. *Thibeault* v. *Poole*, 283 Mass. 480, 482–483. *Bennett* v. *Fitzgerald*, 284 Mass. 535, 537. Compare *Keenan* v. *E. M. Loew's, Inc.* 302 Mass. 309, 311.

The defendants also contend that this testimony should have been struck out for the further reason that the opinion expressed by the plaintiff was broad enough to include all services rendered and was not restricted to services rendered in reliance upon the contract. We think, however, that the fair inference to be drawn from the record is that the plaintiff's testimony related to services rendered under the contract upon which she relied. There was no error in the refusal to strike out this testimony.

The only exceptions that the defendants have argued to the refusal of the judge to give certain instructions to the

jury are as to their fifteenth, sixteenth, and twenty-fifth requests. The fifteenth is: "As a matter of law, if the plaintiff and the defendants' testatrix substituted another contract in February, 1929, for the alleged contract of . . . 1925, then the plaintiff cannot recover in this action for any services rendered in reliance upon the 1925 contract." The sixteenth is: "As a matter of law, if the plaintiff and the defendants' testatrix substituted another contract in September, 1929, for the alleged contract of . . . 1925, then the plaintiff cannot recover in this action for any services rendered in reliance upon the 1925 contract." The twenty-fifth is: "In determining the plaintiff's damage, if any, the jury must consider in modification thereof, any benefit received by the plaintiff from the defendants' testatrix."

As to the fifteenth and sixteenth requests, we have some doubts whether they are fairly open to the defendants in view of the discussion at the close of the evidence, hereinbefore referred to, as to the force and effect of the conversations in 1929. However, at the close of the charge the defendants' counsel stated that the defendants would like to have seventeen requests given, including the fifteenth and sixteenth. In the discussion that ensued nothing whatever was said concerning the fifteenth and sixteenth. The jury was instructed a second time, and finally the defendants asked that their exceptions be noted to the denial of their requests, including the fifteenth and sixteenth. We are of the opinion, however, that the judge was not required to give these two requests. Both are posited upon the substitution of other contracts in February, 1929, and September, 1929. We think it is enough to say that an examination of the conversations in those months, hereinbefore quoted, leads us to the conclusion that there was nothing new in them by way of promise on the part of Miss O'Brien, and nothing new by way of any promise on the part of the plaintiff. It is true that in the February conversation reference was made to the sale of the East Boston property and that the language of Miss O'Brien was that "all my money and my house I will leave to

you"; and that in the fall of 1929 (which we assume to be the September, 1929, referred to in request No. 16) she said, "some day when I am gone, I will leave you my house and everything I have got." Nevertheless, all the conversations express in the same general terms the same request on the part of Miss O'Brien to the plaintiff. It should be borne in mind that technical language was hardly to be expected from a woman approaching seventy years of age and a child in her teens. Underlying all the conversations is the evident desire on the part of Miss O'Brien that the plaintiff remain with her, continue to be her companion, and do her bidding. In all of them we find the reiteration on the part of the plaintiff that she would. No new performance was asked of the plaintiff and no new offer was made by Miss O'Brien. There is nothing in the attendant circumstances to indicate any waiver of an original contract or the formation of a new one. We think there was no error in the denial of these requests.

We do not think that the judge was required to give in terms the twenty-fifth request. If the word "benefit," as the defendants now contend, was intended to mean the board, spending money, and the home which the plaintiff had, we do not think the judge was required to give the request. These were things that the plaintiff had had prior to 1925, and it does not appear that the parties contemplated any change in this respect when the contract of 1925 was made. Compare *Brown* v. *Woodbury*, 183 Mass. 279, 282. If the word "benefit" was intended to refer to a legacy of $500 that was provided for the plaintiff in Miss O'Brien's will, we think that at least the defendants should have said so, and also that upon the evidence the judge was not required to give the request. All that appears in the record is that Miss O'Brien left a will that was executed on November 11, 1931; that the will was probated; and that the plaintiff was left $500 as one of the "beneficiaries of the estate." It does not appear that the plaintiff ever accepted this bequest. It is the general rule in this Commonwealth that where there is no statement in the will that the legacy is in payment of a debt in whole or in part, the

testamentary gift is to be regarded as a benefaction and not as payment of the debt. *Strong* v. *Williams*, 12 Mass. 390. *Smith* v. *Smith*, 1 Allen, 129, 130. *Parker* v. *Coburn*, 10 Allen, 82, 84. *Noyes* v. *Noyes*, 224 Mass. 125, 133.. Compare *Noyes* v. *Noyes*, 233 Mass. 55. Miss O'Brien's will amounted to a repudiation of her promise to the plaintiff, and there is nothing to indicate that her bequest to the plaintiff was intended as a payment, in whole or in part, for the services rendered in reliance upon this promise. The defendants took no exceptions to the charge which of necessity covered the question of damages.

The result is that, in accordance with the terms of the report, which is assented to by all parties, judgment is to be entered for the plaintiff on the verdict.

*So ordered.*