Walter F. BIGGINS, Plaintiff, Appellee,

v.

The HAZEN PAPER COMPANY, et al., Defendants, Appellants.

Walter F. BIGGINS, Plaintiff, Appellant,

v.

The HAZEN PAPER COMPANY, et al., Defendants, Appellees.

Nos. 91–1591, 91–1614.

United States Court of Appeals, First Circuit.

Heard Oct. 11, 1991.

Decided Jan. 8, 1992.

John M. Harrington, Jr. with whom Rob-
ert B. Gordon, Ropes & Gray, Boston,

Mass., Richard D. Hayes, Patrick W. McGinley, Raymond R. Randall and Sullivan & Hayes, Springfield, Mass., were on brief for Hazen Paper Company, et al.

John J. Egan with whom Maurice M. Cahillane and Egan, Flanagan and Cohen, P.C., Springfield, Mass., were on brief for Walter F. Biggins.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and TAURO,* District Judge.

BOWNES, Senior Circuit Judge.

After his employment was terminated at the Hazen Paper Company in June of 1986, Walter F. Biggins sued the company and the two individuals who owned and operated it, Robert Hazen and Thomas N. Hazen. In the district court Biggins obtained an amended judgment against the defendants in the amount of $1.78 million dollars. Both the defendants and the plaintiff appeal this judgment.

## I. BACKGROUND

### A. *The Jury Verdict*

The complaint alleged violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140. Pendent state law claims were also brought under Massachusetts tort and contract law and the Massachusetts Civil Rights Act (MCRA), Mass. Gen.L. ch. 12, §§ 11H and 11I. The case was jury tried.

The jury, in answer to special interrogatories, rendered the following verdict on the federal claims. It found that defendants violated the ADEA and awarded Biggins $560,775 in damages. It also found that the ADEA violation was willful. On Biggins' ERISA claim, the jury found that defendants discharged the plaintiff in order to prevent his pension benefits from vesting. Biggins was awarded $100,000 in damages on the ERISA claim.

The jury found for the plaintiff on four Massachusetts law claims. First, on the

wrongful discharge claim, the jury found that the defendants agreed to compensate Biggins by giving him shares of company stock, and that the defendants wrongfully discharged Biggins in order to deprive him of this promised stock compensation. The jury awarded plaintiff one dollar in compensatory damages on the wrongful discharge claim. The jury also found that the defendants committed fraud by failing to compensate Biggins with the stock he had been promised; it awarded him $315,098 in damages for the fraud. The jury further found that the plaintiff and the defendants had a contract other than of at-will employment, and that the defendants breached this employment contract when they discharged him. Biggins was awarded $266,897 in compensatory damages on this claim. Finally, the jury found that the defendants violated the Massachusetts Civil Rights Act because they interfered with Biggins' exercise of his civil rights through the use of threats, intimidation or coercion. The jury awarded Biggins one dollar in damages on this claim.

The jury was also asked to determine if Biggins was the inventor, developer, and sole rightful owner of a paper coating formula and method that was developed while he worked for the defendants. The jury found that he was not.

### B. *District Court Rulings on Post–Trial Motions*

After the verdict, both the defendants and the plaintiff filed post-trial motions. Defendants filed a motion pursuant to Fed. R.Civ.P. 50(b) for j.n.o.v. or, in the alternative, for a new trial. Defendants also moved to amend or alter the judgment pursuant to Fed.R.Civ.P. 59(e). Plaintiff moved for an award of costs and attorney's fees under federal and state law. Plaintiff also requested that the district court enhance any award of attorney's fees to an amount equal to one-third of the damages awarded.

The court ordered j.n.o.v. on the jury's finding that the ADEA violation was will-

---

* Of the District of Massachusetts, sitting by designation.

ful. That finding, if sustained, would have required an additional payment of liquidated damages equal to the amount of damages awarded for the ADEA violation. The court also ordered j.n.o.v. on the finding of a violation of the Massachusetts Civil Rights Act. In all other respects the court denied the defendants' motion for j.n.o.v. or a new trial. The court also denied the defendants' motion to alter or amend the judgment.

On plaintiff's post-trial motions, the district court further ruled that Biggins was entitled to prejudgment interest "on his entire award because plaintiff is not entitled to liquidated damages." The court granted plaintiff's motion for attorney's fees in the amount of $175,564.57 and for costs in the amount of $9,760.07. It declined to enhance the award of attorney's fees.

### C. *The Issues on Appeal*

The defendants raise three issues on appeal: (1) whether the district court erred in denying their motions for directed verdict and j.n.o.v. on all the claims submitted to the jury; (2) whether the district court erred in denying the defendants' motion to alter or amend the judgment because the damages awarded were excessive, duplicative, and unsupported by the evidence and because the award of prejudgment interest was erroneous as a matter of law; and (3) whether the district court erred in denying defendants' motion for a new trial because the verdict was against the clear weight of the evidence.

Biggins raises three issues on cross-appeal: (1) whether the court erred in granting j.n.o.v. on the jury's finding that the ADEA violation was willful; (2) whether the court erred in granting j.n.o.v. on the Massachusetts Civil Rights Act claim; and (3) whether the court erred by applying the wrong standard in determining the amount of attorney's fees and expenses to be awarded plaintiff.

We apply the same standard of review to the district court's grant or denial of motions for directed verdict and j.n.o.v. *See Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1383 (1st Cir.1991). The standard is *de novo* review "which means that we use the same stringent decisional standards that control the district court." *Hendricks & Assocs., Inc. v. Daewoo Corp.*, 923 F.2d 209, 214 (1st Cir.1991). The standard has been elucidated as follows:

> The district court may grant judgment notwithstanding the verdict "only after a determination that the evidence could lead a reasonable person to only one conclusion," ... namely, that the moving party was entitled to judgment[.] ...
>
> The district court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." The trial court is "compelled, therefore, even in a close case, to uphold the verdict unless the facts and inferences, when viewed in the light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion."

*Id.* at 214 (citations omitted). We review the evidence in our discussion of the issues.

### II. THE ADEA CLAIM

### A. *Sufficiency of the Evidence*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is the foundation case on the order and allocation of proof in an employment discrimination case, where, as here, there is no direct proof of discrimination. The plaintiff must first prove a prima facie case. If this is done, the burden then shifts to the employer to articulate some nondiscriminatory reason for the employee's termination. *Id.* at 802, 93 S.Ct. at 1824. If this is done, the plaintiff has the opportunity to show that the reasons advanced were a cover-up for a discriminatory employment decision. *Id.* at 805, 93 S.Ct. at 1825. *See also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2948–49, 57 L.Ed.2d 957 (1978).

■ There is no doubt that plaintiff here made out a prima facie case of age discrimination. He was within the protected age group. He was sixty-two years old at the time of his termination. He was performing his work at a level that met his employer's legitimate expectations. And he was replaced by someone younger than himself with roughly similar qualifications. *See Mesnick v. General Elec. Co.*, 950 F.2d 816, 823 (1st Cir.1991); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8–9 (1st Cir.1990).

In *Connell v. Bank of Boston*, 924 F.2d 1169 (1st Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991), we held that

> [i]f a *prima facie* case is made, the burden shifts to the employer to articulate some legitimate nondiscriminatory reason for plaintiff's discharge. The articulation of such a reason nullifies the inference raised by the *prima facie* case. Plaintiff must then clear the second hurdle by showing that the employer's articulated reasons were only a pretext for age discrimination. The plaintiff is required to "do more than simply refute or cast doubt," on the employer's rationale. He must "also show a discriminatory animus based on age." The key question becomes whether the employer fired plaintiff because of his age. We do not second-guess the business decisions of an employer.

*Connell*, 924 F.2d at 1172 (citations and footnotes omitted). The defendants in this case articulated legitimate nondiscriminatory reasons for Biggins' discharge. The question is whether there was sufficient evidence for the jury to find that defendants fired plaintiff because of his age. We find that there was.

In order to understand the ADEA evidence we must first outline the evidentiary contours of the case. Hazen Paper Company is a small and successful business located in Holyoke, Massachusetts. It is privately owned and operated by two cousins, Robert Hazen and Thomas N. Hazen. Robert Hazen is the company's president and Thomas Hazen is its treasurer. The company is engaged in the manufacture of coated, foil laminated, and printed paper and paperboard for use in such products as cosmetic wrap, lottery tickets, and pressure sensitive items. It is known as a paper converter.

Biggins was hired by Hazen Paper in 1977 as its first technical director. There was no written employment contract. Biggins was fifty-two years old when he was hired. He held a Bachelor's degree and a Master's degree in chemistry and had spent his prior work life as a technician-chemist in the paper industry.

Biggins worked for Hazen Paper for over nine and one-half years. One of the problems that Hazen Paper and the paper converter industry faced at the time Biggins started his employment was the elimination of hazardous emissions from the nitrocellulose and vinyl coatings then in general use. The elimination of such emissions was mandated by the Clean Air Act. Biggins developed a water-based paper coating that both exceeded the requirements of applicable environmental laws and resulted in a superior product in terms of gloss and durability.

By the mid–1980s that coating, referred to at trial as "Biggins Acrylic," was widely used by Hazen Paper. The company's sales increased substantially as a result of the use of the coating developed by Biggins. In 1983 Biggins became aware of this increase in sales and of the fact that the commissions of one of its sales representatives, Robert Hutchinson, had increased dramatically (to over $200,000). Because he felt that these sales commission were being made on "something that I had developed," Biggins sought an increase in pay from the company. After a meeting in 1983 with Thomas and Robert Hazen, Biggins' salary was increased by ten percent.

Biggins, however, remained dissatisfied with his compensation. In 1984, Biggins again sought an increase in his salary, which by this time was $44,000. Biggins testified that in July of 1984 he approached Thomas Hazen to tell Hazen that he wanted a raise and that he thought he was

worth $100,000 to the company. According to Biggins, Hazen told him that "nobody in the company" was being paid that amount and that Hazen could not give him a salary increase to $100,000. Biggins testified that Hazen nonetheless indicated that "he would be willing to give me a piece of the company in stock, and that ... my fortune could increase as the fortunes of the company did." Biggins also stated that Hazen said that he was prepared to "mak[e] up the difference between my salary and $100,000 in stock." Thomas Hazen denied emphatically that he promised to give Biggins any stock.

While Biggins was working for Hazen Paper, he also was involved in two private business ventures with his son. One had to do with cleaning up hazardous wastes and recovering dirty solvents produced by automobile repair shops and paper companies. The other venture was a consulting business in the environmental/regulatory compliance area, which involved explaining to small businesses what was required under applicable regulations. When Thomas Hazen learned of the clean-up business, he concluded that Biggins had taken personal advantage of his employment at the company and that there was a great risk of Biggins disclosing company secrets to its competitors. Thomas Hazen and his cousin, Robert, told Biggins that this activity was "outrageous." Thomas Hazen had a confidentiality agreement drawn up which restricted Biggins' outside activities during his employment and for a limited time after his employment ceased. Biggins indicated he would sign the agreement if he was given a raise, but Thomas Hazen would not agree to this. He told Biggins that unless he signed the agreement as it stood, his employment would be terminated. Biggins refused to do so and his employment with Hazen Paper ceased on June 13, 1986. At the time Biggins was terminated, his pension rights, which were worth about $93,-000, had not vested. They would, however, have vested a few weeks later if Biggins had not been fired.

We now turn to the evidence bearing directly on the ADEA claim. Biggins testified that both Robert and Thomas Hazen made critical comments about his age. On one occasion, Robert Hazen took out a membership for company employees in a handball court in Holyoke. At that time he told Biggins and another employee, who was a year older than Biggins, that it would not do them much good because they were "so old." On another occasion, Thomas Hazen reminded Biggins that it was costing the company a lot more for his life insurance policy because he was "so old."

The most significant evidence on the ADEA claim comes from the facts and circumstances surrounding the termination of Biggins' employment. Biggins was asked by Thomas Hazen to sign a confidentiality agreement in the spring of 1986 because, according to Hazen, he felt that Biggins's outside business venture was improper and a threat to the company. Negotiations relative to Biggins signing the confidentiality agreement continued for weeks, during which time Biggins stated repeatedly that he would not sign the agreement unless his remuneration was increased. Thomas Hazen brought matters to a head by telling Biggins on June 13, 1986, that there would be no pay increase, and unless he signed the agreement, he would be fired. Biggins refused to do so and his employment was terminated on that date.

Defendants hired a younger man to replace plaintiff, one Timothy McDonald. A confidentiality agreement was given to McDonald. It provided for 100 days separation pay. By contrast, the confidentiality agreement offered Biggins had no such provision for severance pay. McDonald's agreement also contained a six-month non-competition clause. In the agreement tendered the plaintiff, the non-competition clause was for two years.

As of June 13, 1986, Biggins had worked for the defendants for more than nine and one-half years. He was sixty-two years old. It is uncontradicted that had Biggins worked for the company a few more weeks, his right to a pension would have vested. There was uncontradicted evidence that at the time of Biggins' termination no one else in the company was subject to a confidentiality agreement.

There was additional testimony that when Thomas Hazen was told by Biggins that he would not sign the confidentiality agreement unless it was accompanied by an increase in remuneration, Hazen suggested Biggins become a consultant to the company. Biggins would then no longer have been an employee of the company and would have lost his rights to all employee benefits. Finally, Thomas Hazen testified that he was "absolutely" aware that age discrimination was illegal.

Based on the foregoing evidence, the jury could reasonably have found that Thomas Hazen decided to fire Biggins before his pension rights vested and used the confidentiality agreement as a means to that end. The jury could also have reasonably found that age was inextricably intertwined with the decision to fire Biggins. If it were not for Biggins' age, sixty-two, his pension rights would not have been within a hairbreadth of vesting. Biggins was fifty-two years old when he was hired; his pension rights vested in ten years.

Based on our review of the evidence, we find that it was within the province of the jury to decide whether age was a determining factor in the defendants' decision to terminate Biggins' employment.

## B. *Was There a Willful Violation of the ADEA?*

The enforcement section of the ADEA contains the following provision: *"Provided,* That liquidated damages shall be payable only in cases of willful violations of this chapter." 29 U.S.C. § 626(b). The ADEA, in § 626(b), adopts the definition of liquidated damages established in the Fair Labor Standards Act, 29 U.S.C. § 216(b). Liquidated damages are defined as an amount equal to the pecuniary losses suffered by the discharged employee by way of lost wages, salary increases and other benefits. *See Air Line Pilots Ass'n, Int'l v. Trans World Airlines, Inc.,* 713 F.2d 940, 956 (2d Cir.1983), *aff'd in part and rev'd in part sub nom. Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).

In reviewing the *Trans World Airlines* case, which focused on the application of a company-wide plan or policy, the Supreme Court held that an acceptable definition of "willful violation" was the one used by the Second Circuit: "[A] violation is 'willful' if 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Thurston,* 469 U.S. at 128, 105 S.Ct. at 625 (citation omitted). The Court held that "Congress intended for liquidated damages to be punitive in nature." *Id.* at 125, 105 S.Ct. at 624. The Court noted:

> Courts below have held that an employer's action may be "willful," within the meaning of § 16(a) of the FLSA, even though he did not have an evil motive or bad purpose. We do not agree with TWA's argument that unless it intended to violate the Act, double damages are inappropriate under § 7(b) of the ADEA. Only one Court of Appeals has expressed approval of this position. *See Loeb v. Textron, Inc.,* 600 F.2d 1003, 1020, n. 27 (CA1 1979).

*Id.* at 126 n. 19, 105 S.Ct. at 624 n. 19 (citation omitted). This means, as we understand it, that evil purpose or bad motive are not necessary components of a willful violation.

In a subsequent Fair Labor Standards Act case the Court reaffirmed the definition of a willful violation enunciated in *Thurston.* "The standard of willfulness that was adopted in *Thurston*—that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute—is surely a fair reading of the plain language of the Act." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988).

As already noted, *Thurston* involved the application of a company policy to a group of employees. The courts of appeals have had some trouble fitting the *Thurston* standard of willfulness to disparate treatment cases. As a result the circuits have arrived at differing interpretations and modifications of *Thurston.* We, therefore,

turn to a review of the relevant cases before attempting to formulate our own definition of willfulness in a disparate treatment case.

The Second Circuit has taken a "continuum" approach.

In light of *Thurston*, we think that "willfulness" is most easily understood when the term is analyzed along a continuum. Using that concept, at one extreme there is no liability for liquidated damages when a plaintiff proves only that the employer acted negligently, inadvertently, innocently, or even, if the employer was aware of the applicability of the ADEA, and acted reasonably and in good faith. *See McLaughlin*, 108 S.Ct. at 1681–82. The opposite point of the spectrum is revealed when a plaintiff establishes that the employer had an evil motive: such showing is sufficient for double damages, but is not necessary for an award of liquidated damages. *See Thurston*, 469 U.S. at 126 n. 17, 105 S.Ct. at 624 n. 17. Thus, in the middle of the spectrum, double damages may properly be awarded when the proof shows that an employer was indifferent to the requirements of the governing statute and acted in a purposeful, deliberate, or calculated fashion.

*Benjamin v. United Merchants and Mfrs. Inc.*, 873 F.2d 41, 44 (2d Cir.1989).

The Third Circuit has added a requirement of "outrageous conduct" to the *Thurston* factors:

Where an employer makes a decision such as termination of an employee because of age, the employer will or should have known that the conduct violated the Act. Nonetheless, in order that the liquidated damages be based on evidence that does not merely duplicate that needed for the compensatory damages, there must be some additional evidence of outrageous conduct.

*Dreyer v. Arco Chemical Co., Div. of Atlantic Richfield Co.*, 801 F.2d 651, 658 (3d Cir.1986). The Third Circuit felt that under *Thurston* it "must interpret the liquidated damages provisions in a way that would not permit 'an award of double damages in almost every case'...." *Id.* at 657 (citation omitted). It found its basis for adding this requirement of outrageous conduct in the Restatement (Second) of Torts § 908(2). *Id.* The Court also held: "If an employer can show good faith and reasonable grounds for believing it was not in violation of the Act, a willfulness finding would be inappropriate." *Id.* at 658 (citations omitted). *See also Turner v. Schering–Plough Corp.*, 901 F.2d 335, 346 (3d Cir.1990).

In *Taylor v. Home Insurance Company*, 777 F.2d 849, 859 (4th Cir.1985), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986), the Fourth Circuit adopted the *Thurston* definition of willfulness without discussion.

The Fifth Circuit has interpreted *Thurston* to mean that "good faith" is no longer a valid defense to a willfulness claim:

Under the *Thurston* rule, however, "good faith" can no longer coexist with "willfulness." The result is that only "knowing" or "reckless" violations of the ADEA are subject to liquidated damages. Thus, a further examination of good faith becomes irrelevant because it has already been factored into the *Thurston* "willfulness" definition.

*Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 287 (5th Cir.1986). In *Hansard v. Pepsi–Cola Metropolitan Bottling Co.*, 865 F.2d 1461 (5th Cir.), *cert. denied*, 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989), the court appears to have added an egregious violation requirement to the *Thurston* standard of "knowing or reckless disregard":

The Supreme Court has held that liquidated damages are a punitive sanction and should be reserved for the most egregious violations of the ADEA. Liquidated damages should not be awarded unless the defendant acted knowingly or recklessly.

The evidence is this case was weak. There is simply no evidence that Pepsi's actions were so egregious as to justify finding a willful violation. Pepsi was entitled to judgment on this issue.

*Id.* at 1470 (citations omitted).

In *Schrand v. Federal Pacific Electric Co.*, 851 F.2d 152 (6th Cir.1988), the Sixth

Circuit followed the Tenth Circuit and held that a defendant's conduct could be willful "only if age was the predominant factor in the decision to terminate the plaintiff." *Id.* at 158. *See also Wheeler v. McKinley Enter.*, 937 F.2d 1158, 1164 (6th Cir.1991).

The Seventh Circuit follows *Thurston's* knowing or reckless disregard definition. *Brown v. M & M/Mars*, 883 F.2d 505, 512 (7th Cir.1989). It squarely rejected the Third Circuit's addition of outrageous conduct to the *Thurston* formula. *Id.* at 513.

The Eighth Circuit applies the *Thurston* standard as follows:

> We think *Thurston* means at least this: if the people making the employment decision know that age discrimination is unlawful, and if there is direct evidence—more than just an inference from, say, an arguably pretextual justification—of age-based animus, the trier of fact may properly find willfulness.

*Neufeld v. Searle Lab.*, 884 F.2d 335, 340 (8th Cir.1989). *See also Beshears v. Asbill*, 930 F.2d 1348, 1356 (8th Cir.1991).

The Ninth Circuit follows the *Thurston* standard unadorned and has applied it retroactively. *Gilchrist v. Jim Slemons Imports, Inc.*, 803 F.2d 1488, 1494–95 (9th Cir.1986).

The Tenth Circuit, after a careful analysis of *Thurston* and a survey of the standards adopted in other circuits, held:

> Under the standard we adopt today, a basic finding of liability under the Act requires that age be at least one of possibly several "determinative factors" in the employer's conduct; for a willful violation to exist in a disparate treatment claim, a factfinder must find that age was the *predominant* factor in the employer's decision.

*Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1551 (10th Cir.1988).

The Eleventh Circuit follows *Thurston* without qualification. *Formby v. Farmers & Merchants Bank*, 904 F.2d 627, 632 (11th Cir.1990). *See also Lindsey v. American*

*Cast Iron Pipe Co.*, 810 F.2d 1094, 1099–1101 (11th Cir.1987).

Finally, we turn to our own circuit. *Loeb v. Textron Inc.*, 600 F.2d 1003 (1st Cir.1979), which was decided before *Thurston*, is the seminal case.[1] Our definition of willfulness as requiring bad purpose has been rejected by *Thurston*. *See Thurston*, 469 U.S. at 126 n. 19, 105 S.Ct. at 624 n. 19. Specific intent to violate the ADEA is, therefore, not required to establish a willful violation.

In *Loeb*, after discussing the jury instructions on application of the *McDonnell Douglas* formula to an ADEA violation claim, we adopted the following standard governing proof of an ADEA violation:

> We do not quarrel with the court's statement that age did not have to be the sole factor motivating defendants to act; we do think, however, that the court should have instructed the jury that for plaintiff to prevail he had to prove by a preponderance of the evidence that his age was the "determining factor" in his discharge in the sense that, "but for" his employer's motive to discriminate against him because of age, he would not have been discharged.

*Loeb*, 600 F.2d at 1019. The "determining factor" or "but for" test has been consistently followed by us in ADEA cases in which the *McDonnell Douglas* formula applies. *See e.g., Mesnick v. General Electric Co.*, 950 F.2d at 824–25; *Connell*, 924 F.2d at 1172; *Medina–Munoz*, 896 F.2d at 9; *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1110–11 (1st Cir.1989); *Menard v. First Sec. Serv. Corp.*, 848 F.2d 281, 285 & 287 (1st Cir.1988).

In this circuit, the "determining factor" ingredient added by the Sixth and Tenth Circuits to the *Thurston* standard for proof of a "willful" violation of ADEA in disparate treatment cases is already a basic requirement for proof of the underlying ADEA violation itself.

---

**1.** *Loeb* held, *inter alia*, that in this circuit good faith could not be used as a defense in an ADEA case. *Id.* at 1020. We agree with the Fifth Circuit's decision in *Powell v. Rockwell Int'l.*

*Corp.*, 788 F.2d 279, 287 (5th Cir.1986), that *Thurston* has rendered the issue of good faith irrelevant.

With due respect, we cannot accept the Third Circuit's outrageous conduct requirement. This seems to us to fly in the face of *Thurston,* and we find the term "outrageous" simply too amorphous to be of assistance in determining what constitutes a willful violation.

■ We, therefore, adopt, without modification or qualification, the *Thurston* test for willfulness: "a violation is 'willful' if 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Thurston,* 469 U.S. at 128, 105 S.Ct. at 625 (citation omitted). We realize that in many cases this will result in a willful violation following hard on the heels of an ADEA violation, but that is the nature of the beast in a disparate treatment case, at least until either the Congress or the Supreme Court changes the definition of willfulness. *See Burlew v. Eaton Corp.,* 869 F.2d 1063, 1067 (7th Cir.1989).

■ We now apply the standard to this case. The principal owner of the company, Thomas Hazen, testified that he was "absolutely" aware that age discrimination was illegal. This is as strong evidence of a knowing violation of ADEA as a plaintiff could wish. In his charge to the jury, the district judge instructed that "age must have been the determining factor" in plaintiff's discharge for the defendant's to be found liable. This was in accord with the rule of this circuit. The court's instruction on willfulness was as follows:

I will now instruct you on the meaning of willfulness.

Under Federal law, an act is done willfully if done voluntarily and intentionally, and with a specific intent to do something the law forbids.

You may find that Defendants willfully violated the age discrimination law if you find that one, that Defendants knew of or showed reckless disregard for, the law prohibiting age discrimination.

And two, that Defendants, with bad purpose, intentionally disobeyed or ignored the law.

In sum, if you find in Plaintiff's favor on the age discrimination claim, you must also decide whether the Plaintiff proved by a preponderance of the evidence that the violation was willful. You should not award any damages for the willfulness of the violation itself. You need only decide whether the violation of the age discrimination law is willful.

This instruction went further then necessary because the "bad purpose" requirement established by this circuit in *Loeb* was eliminated by *Thurston.* 469 U.S. at 126 n. 19, 105 S.Ct. at 624 n. 19. The instruction misstated the applicable law, and thereby prejudiced the plaintiff because it held him to a higher standard of proof than is required by *Thurston* and this circuit.

■ Because the jury nonetheless found in plaintiff's favor, however, the error was harmless. The jury's finding of a willful violation of the ADEA had a solid evidentiary foundation and was in accord with jury instructions that correctly stated the applicable law except as to the requirement of "bad purpose." It was error for the district court to grant defendants' motion for j.n.o.v. on this count. The finding by the jury that there was a willful violation is reinstated.

**C.** *Damages Under the ADEA*

■ We next address the defendants' claim that the ADEA damages award was excessive, duplicative, and contrary to the evidence. Plaintiff suggests that defendants are foreclosed from raising this issue now because it was not raised below. Our review of the record discloses that, although it was not raised as explicitly below as it is here, it was argued sufficiently in defendants' post-trial motions so that the court was aware of its contours and implications. *See* Memorandum and Order, *Biggins v. Hazen Paper Company,* No. 88–00225–F, slip. op. at 35–36 (D.Mass. filed April 5, 1991).

Ruling on the defendants' motion for a new trial, the district court stated:

It is uncontested that plaintiff alleged total damages in the amount of $1,375,614.12. Plaintiff offered the testimony

of Dr. Moore and Mr. Moriarty in support of that allegation, and their testimony was unrefuted. It is also true that the jury awarded a total of $1,242,772.00 in damages on all seven counts, some $132,842 less than the damages claimed by plaintiff. Because the jury did not select for total damages a figure higher than that alleged by plaintiff and evidenced in the record, the Court will not set aside any portion of the verdict on this basis.

*Id.* at 36 (citations omitted). We think the ruling contained in the last sentence of this order was error. Damages should not have been treated on an across-the-board basis. The jury was instructed on damages count by count and returned an award on each count separately. The damages awarded on each count should have been examined separately, not as a lump sum. This is particularly so in an ADEA award because liquidated damages always loom over the award.

Defendants argue that the evidence established that plaintiff's pretrial losses for the ADEA violation totalled $419,454.38 and that the award of $560,775.00 was excessive by the amount of $141,320.62. Plaintiff counters that there was evidence from which the jury could have awarded damages in excess of $650,000.

Plaintiff put in evidence, as exhibit 21, a document entitled "Summary of Loss." It was in effect a summary and condensation of the testimony of the two expert witnesses on damages who testified on behalf of plaintiff. The damages to which plaintiff was entitled for the ADEA violation were as follows: cash loss—$234,841.55; bonus loss—$131,275.88; lost benefits—$53,336.95. These sums totalled $419,454.38. This was all for which there was evidentiary support.[2]

The jury award of $560,775 is reduced to $419,454.38. Because we have found that there was a willful violation of the ADEA, plaintiff is entitled to liquidated damages

equivalent to the amount. Damages on the ADEA count, therefore, amount to $838,908.76.

## III. THE ERISA CLAIM

■ Defendants argue that the jury verdict finding liability under ERISA was erroneous as a matter of law because there was no evidence to support a reasonable finding that plaintiff was discharged with the specific intent of interfering with his pension vesting. We need not linger long on this issue. Plaintiff was discharged within weeks before the vesting of his pension. Although plaintiff was fired ostensibly because he refused to sign the confidentiality agreement, the jury could have found that the real reason was to deprive him of his pension benefits. The jury was entitled to draw reasonable inferences from the proximity of the date of firing and the date of vesting of plaintiff's pension.

■ We agree with the defendants that there should be a remittitur on the jury award of $100,000, but not of $30,000. Viewing the evidence in the light most favorable to the plaintiff, the jury could have found that he was deprived of pension funds worth $93,000. There is no basis in the record for an amount greater than that. There must, therefore, be a remittitur on this count of $7,000.

## IV. MASSACHUSETTS LAW CLAIMS

The defendants also challenge the district court's denial of their motions for directed verdict and j.n.o.v. on three of the Massachusetts law claims, contending that the evidence could not reasonably have permitted the jury to find in favor of Biggins. Specifically, the appellants challenge the sufficiency of the evidence to sustain findings of liability against them under Massachusetts law for (1) wrongful discharge; (2) common law fraud; and (3) breach of a contract embodied in the Hazen Paper

---

**2.** In this exhibit, the plaintiffs also alleged an additional "stock loss" of $342,498. On appeal, plaintiffs do not argue that the jury's award of damages in excess of $419,454.38 could have been derived from this figure. We also note

that, as discussed in Part V, *infra*, we consider the stock loss for which Biggins recovered on the common law fraud claim separate and distinct from the $419,454.38 in back pay recovered under the ADEA claim.

Company's 1980 Employee Handbook. On cross-appeal, Biggins contests the district court's grant of j.n.o.v. reversing the jury's finding of liability against the defendants under the Massachusetts Civil Rights Act. We apply the same *de novo* standard of review on the state law claims as we did on the federal claims.

### A. *Wrongful Discharge*

Count IV of the complaint charged the defendants with "wrongful discharge" of Biggins in violation of Massachusetts law governing the termination of at-will employment. In *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), the Massachusetts Supreme Judicial Court recognized that "an employer may not in every instance terminate without liability an employment contract terminable at will." *Cort v. Bristol–Myers Co.*, 385 Mass. 300, 431 N.E.2d 908, 910 (1982). *Fortune* and subsequent decisions establish that an enforceable claim for breach of a contractual condition of good faith will lie when the termination of an at-will employee is contrary to public policy. *Cort*, 431 N.E.2d at 910. *See also Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 27–29 (1981); *Tenedios v. Wm. Filene's Sons Co.*, 20 Mass.App.Ct. 252, 479 N.E.2d 723, 726 (1985); *Siles v. Travenol Laboratories, Inc.*, 13 Mass.App.Ct. 354, 433 N.E.2d 103, 106, *app. denied*, 386 Mass. 1103, 440 N.E.2d 1176 (1982).

In *Cort* and *Gram*, the Massachusetts Supreme Judicial Court found that an "employer's predatory motivation ... can be classified as a reason contrary to public policy." *Cort*, 431 N.E.2d at 910; *Gram*, 429 N.E.2d at 29. In *Gram*, the Supreme Judicial Court held that

> the obligation of good faith and fair dealing imposed on an employer requires that the employer be liable for the loss of compensation that is so clearly related to an employee's past service, when the employee is discharged without good cause.

*Gram*, 429 N.E.2d at 29. In establishing these principles governing the liability of an employer for an employee's discharge in the absence of good cause, the *Gram* court

was careful to distinguish between recovery based on the employee's loss of future wages for *past* services, and any claim for recovery based on loss of *future* income for future services. *Id.* The Massachusetts Supreme Judicial Court explicitly limited this theory of "wrongful discharge" to situations in which the employee's discharge without good cause deprives the employee of compensation for services previously earned or past services. *Cort*, 431 N.E.2d at 908. In order to establish a claim of wrongful termination, the discharge must be

> contrived to despoil an employee of earned commission or similar compensation due for past services.... That the plaintiff was fired arbitrarily and was injured in her expectations of future wages or other future emoluments does not, without more, encompass the *Fortune*-type of liability, however meretricious we may consider the dismissal to have been.

*Tenedios*, 479 N.E.2d at 726 (citations omitted).

In the instant case, the jury found that the defendants had agreed in 1984 to compensate Biggins with shares of Hazen Paper Company Stock. It also found that the defendants wrongfully discharged Biggins in 1986 in order to deprive him of the promised stock compensation. The jury awarded one dollar in compensatory damages. In motions for directed verdict and j.n.o.v., the defendants attacked the legal sufficiency of the evidence to support a finding of wrongful discharge. In both motions, they insisted that the promise of stock to Biggins was not an enforceable contract. They argued that a contract could not have been formed because Biggins did not own the formula for the acrylic process which he allegedly used as the bargaining chip for the stock. Lack of ownership of the rights to that formula meant that Biggins could not have given any consideration in return for the promise of stock. Consequently, the defendants claimed that because there was no consideration for the alleged stock agreement, there was no enforceable contract for the payment of stock, and therefore no depri-

vation of past "compensation" already earned within the meaning of *Fortune* and its progeny.

The district court rejected these arguments, holding that Biggins provided "ample consideration" for the alleged stock agreement—namely, "the present and continued satisfactory performance of services for Hazen Paper Company." The court noted that the jury's rejection of Biggins' claim of ownership of the acrylic formula precluded argument by Biggins that his ownership of the formula constituted valid consideration for the stock promise. Nonetheless, the court concluded that Biggins' continued service as an employee of the company subsequent to the alleged stock promise would in and of itself constitute adequate consideration for any stock agreement.

On appeal, the defendants renew the argument that the evidence was legally insufficient to establish that Thomas Hazen's promise of stock to Biggins in 1984 was earned, contractually-established "compensation." They insist that there can be no *Fortune*-based claim because Biggins failed to establish any contractual expectancy that was in fact defeated by reason of his discharge from employment.

■ Viewing the evidence in the light most favorable to the non-moving party, we find that the district court correctly concluded that there was adequate evidence to support the jury's finding that consideration sufficient to support an agreement for "compensation" inhered in Biggins' continued performance of services for the Hazen Paper Company. Biggins testified that when he requested a raise in his annual compensation in 1984, Thomas Hazen promised to give him stock worth

the difference between his pre-existing $44,000 annual compensation and a $100,000 annual compensation level. The jury could have found that Biggins' decision to continue as an employee with Hazen Paper was consideration for an agreement to increase his annual compensation. *See Jackson v. Action for Boston Community Dev., Inc.,* 403 Mass. 8, 525 N.E.2d 411, 415 (1988) (citing *Simons v. American Dry Ginger Ale Co.,* 335 Mass. 521, 526, 140 N.E.2d 649 (1957)) (for an employee to remain with employer can, in appropriate circumstances, supply adequate consideration for employment contract). We, therefore, hold that there was adequate evidence to support the jury's finding that Biggins' discharge in 1986 deprived him of "compensation" for past services within the meaning of Massachusetts wrongful discharge doctrine.

■ We find unavailing appellants' continued insistence that any promise of stock by Thomas Hazen to Biggins could never have constituted an enforceable contract.[3] The appellants renew the argument made below that any offer of stock by Thomas Hazen which did not specify the quantity or class of stock promised, or the time of its delivery to Biggins, would lack the requisite definiteness to be enforced as a contract. We think that the issue of whether Thomas Hazen's alleged offer of stock was sufficiently definite was a question of fact, which the jury could properly resolve in favor of Biggins. *See, e.g., Rizzo v. Cunningham,* 303 Mass. 16, 20 N.E.2d 471, 474 (1939) ("where a contract is oral, the question of what the contract is must, if controverted, be tried by a jury as a question of fact....").[4] There was evidence for the

---

**3.** Appellants claim that "plaintiff at no time suggested in any of his pleadings below that he was entitled to Hazen Paper stock as a matter of contract law." We note that ¶ 11 of Biggins' Amended Complaint alleges that in response to Thomas Hazen's promise that he would provide Biggins with stock "sufficient to raise his salary ... [to] $100,000[,] [t]he plaintiff agreed to this offer and in reliance on the defendant's promise continued to allow the defendant company to make use of his formula and process ... *and continued his employment with the defendant corporation.*" (Emphasis added). While Big-

gins did not allege any independent claim of breach of contract based on failure to deliver the allegedly promised stock, it is clear that in his wrongful discharge claim Biggins alleged the contractual elements necessary to support a claim of deprivation of previously earned "compensation."

**4.** In *Rizzo,* the Massachusetts Supreme Judicial Court reinstated a jury verdict in favor of a plaintiff seeking to recover on an oral contract for personal services. The Court concluded that

jury to find that Hazen's promise of an amount of stock necessary to raise Biggins' annual compensation to the amount of $100,000 was sufficiently definite to create an enforceable contract.[5]

Because the jury could have determined that Hazen's promise of stock was an enforceable oral contract properly supported by consideration, we see little merit in the appellants' other arguments challenging the adequacy of proof of various elements necessary for Biggins to make out his wrongful discharge claim. The defendants insist that the promise of stock was ambiguous as to the time of its delivery and that any "compensation" due Biggins was "future" rather than "past" earnings—and therefore not properly recoverable under the *Fortune* doctrine. This argument is without merit. If Biggins was promised stock in 1984 sufficient to raise his overall annual compensation to $100,000, the jury had ample evidence to determine that his discharge from Hazen Paper Company in 1986, without delivery of the promised stock, was a deprivation of "past" earnings. Equally lacking in merit is appellants' argument that Biggins' discharge in 1986 did not directly cause him to forfeit the promised stock. We can see no distinction between the situation of an employee whose discharge is intended by his employer to deprive him of previously earned wages or sales commissions, and that of an employee discharged by his employer in order to deprive him of stock promised as supplemental annual compensation. A jury could in both instances find that this discharge was "contrived to despoil an employee of earned commission or

similar compensation due for past services...." *Tenedios,* 479 N.E.2d at 726 (citations omitted).

### B. *Common Law Fraud*

Defendants next attack the sufficiency of the evidence supporting the jury's verdict awarding $315,098 in damages on Biggins' claim of common law fraud. The defendants contend that the district court improperly denied its motions for directed verdict and j.n.o.v. because the evidence did not sufficiently establish certain of the elements necessary to sustain a fraud claim under Massachusetts law. As we observed in one such case under Massachusetts common law,

the standard for setting aside a jury verdict is a rigorous one.... [W]e must find that no jury could reasonably find that all five elements of common law fraud were met with respect to the alleged misrepresentation and omissions. These elements are: (1) that the statement was knowingly false; (2) that [the defendant] made the false statement with intent to deceive; (3) that the statement was material to the plaintiffs' decision to [enter] the contract; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance.

*Turner v. Johnson & Johnson,* 809 F.2d 90, 95 (1st Cir.1986).

The defendants' principal contention on appeal is that the evidence was not sufficient to establish that Biggins relied on the stock promise to his detriment and thereby suffered damages as a result of his remaining as an employee at Hazen Paper.[6] The

"the conversation upon which the jury was permitted to find an agreement ... was not too vague and indefinite to form the basis for a contract." 20 N.E.2d at 475.

5. The appellants also argue that any contract based on an agreement to give Biggins stock in the Hazen Company would not be enforceable because it was an oral promise unsupported by a writing that would fail under the Massachusetts statute of frauds. In the district court below, however, appellants never raised this argument, preferring instead to rely on assertions that there could have been no consideration for any contract based on Biggins' ownership of the

formula for the acrylic. Because the defendants did not raise these objections in the district court, we decline to address them on appeal. *See, e.g., Boston Celtics Ltd. Partnership v. Shaw,* 908 F.2d 1041, 1045 (1st Cir.1990).

6. The defendants also challenge the adequacy of the fraud claim with an argument not raised in either of their motions for directed verdict and j.n.o.v. in the district court. They now claim that Thomas Hazen did not make a false promise of stock to Biggins with the present intention not to fulfill that promise. Appellants waived this argument through their failure to present it

defendants insist that Biggins offered no evidence to show that he gave up other employment opportunities as a result of the promise of the stock, or that he remained at Hazen Paper after 1984 *because* of the promise. The defendants also challenge the district court's denial of j.n.o.v. on their argument that the detrimental reliance element was lacking. They argue that the district court misconstrued Massachusetts law when it held that Biggins had satisfied the detrimental reliance element by the simple fact of his remaining as an employee of the company subsequent to the stock promise.

■■■ Proof of detrimental reliance is a necessary element of a fraud claim under Massachusetts law. *See McEvoy Travel Bureau, Inc. v. Norton Co.,* 408 Mass. 704, 563 N.E.2d 188, 192 (1990) (citing *Barrett Assocs., Inc. v. Aronson,* 346 Mass. 150, 152, 190 N.E.2d 867 (1963)); *Robertson v. Gaston Snow & Ely Bartlett,* 404 Mass. 515, 536 N.E.2d 344, 349, *cert. denied,* 493 U.S. 894, 110 S.Ct. 242, 107 L.Ed.2d 192 (1989); *Snyder v. Sperry & Hutchinson Co.,* 368 Mass. 433, 333 N.E.2d 421, 428 (1975); *Schinkel v. Maxi–Holding, Inc.,* 30 Mass.App.Ct. 41, 565 N.E.2d 1219, 1224, *review denied,* 409 Mass. 1104, 569 N.E.2d 832 (1991). At the outset, we note that we agree with the district court's conclusion that Biggins could not have suffered "detriment" as a result of a loss of rights to the formula under the terms of a stock agreement with the defendants. Because the jury found that Biggins never in fact owned the formula, he cannot assert that he relied on Thomas Hazen's stock promise to his detriment when he gave up various offers to sell the rights to that formula abroad.[7] Thus, in order for the jury to have properly reached its finding of fraud by the defendants, it must be shown there was other evidence legally sufficient to establish Biggins' detrimental reliance. ·

■■■ The district court's denial of j.n.o.v. rested on the finding that Biggins'

"rendition of present and continuing services at Hazen Paper Company provide[d] the legal detriment for the fraud claim." That conclusion, in turn, relied on the assumption that under Massachusetts law, Biggins' continued services "in exchange for the stock promise [was] sufficient to provide 'detrimental reliance.'" After review of the applicable case law, we hold that the district court correctly interpreted Massachusetts law when it concluded that under the circumstances Biggins' continued employment was a legally sufficient form of detrimental reliance that could have supported the jury's verdict.

Massachusetts law recognizes that an affirmative act by the victim of fraudulent conduct is not required to establish the element of detrimental reliance:

It is the settled law of this Commonwealth in actions for deceit ... that the representations need not be the sole or predominating motive that induced the victim to part with his money or property, but that it is enough if they alone or with other causes materially influenced him *to take the particular action that the wrongdoer intended he should take as a result of such representations and that otherwise he would not have taken such action.*

*National Shawmut Bank v. Johnson,* 317 Mass. 485, 58 N.E.2d 849, 852 (1945) (citations omitted and emphasis added). *See also* 14A D. Simpson & H. Alperin, Massachusetts Practice: Summary of Basic Law § 1795 (1974) (reliance can be shown where the victim of fraud "does not do what he had intended and started to do and would have done save for the fraud practiced upon him"); Restatement (Second) of Torts § 531 (1977) ("[O]ne who makes a fraudulent misrepresentation is subject to liability to the person[ ] ... whom he intends or has reason to expect to act or refrain from action in reliance upon the misrepresentation...."). In a situation in which the

---

to the district court. *See Boston Celtics Ltd. Partnership,* 908 F.2d at 1045.

**7.** In any case, the record does not support Biggins' repeated insistence that the jury was

presented with evidence showing that he gave up a specific opportunity to sell the rights to the formula after the alleged stock-for-rights agreement with Hazen in 1984.

object of an employer's fraud is to prevent an employee from leaving his job, we do not think that an employee's fraud claim fails as a matter of law because the employee does not offer evidence of specific instances in which alternative offers of employment were rejected on the strength of the employer's fraudulent promises.[8]

■ Here, as discussed *supra,* the jury could properly have found that Biggins and the defendants entered into an enforceable agreement for the payment of stock compensation. Both employer and employee were therefore subject to a requirement that "parties to contracts, whether experienced in business or not, should deal with each other honestly, and ... should not be permitted to engage in fraud to induce the contract." *McEvoy Travel Bureau,* 563 N.E.2d at 194 (citations omitted). We think that it would defeat this principle to require as a matter of law that an employee offer proof of missed employment opportunities in a fraud claim against an employer whose very purpose was to secure the employee's forbearance from seeking alternative employment. We thus reject the appellants' contention that Biggins' proof of the element of detrimental reliance fails as a matter of law.

■ The jury heard evidence that Biggins approached Thomas Hazen in 1984 with a demand for additional compensation that would raise his salary to an annual rate of $100,000. The jury could have inferred that this demand was an implicit threat by Biggins that he would not otherwise continue in his job. There was further evidence to support the conclusion that as a result of a promise of stock, Biggins remained at the company and referred to his son certain business opportu-

nities that became available to him. A jury could have determined that Biggins, who was fifty-nine years old at the time of the stock agreement, decided as a result of the promise of stock to forego any attempt to seek alternative (or independent) employment during the remainder of his career. The jury could have found damages for this forbearance based on the difference between Biggins' salary and the promised stock compensation that would have raised his annual salary to $100,000.

Based on this evidence and our reading of Massachusetts law, we conclude that the district court correctly denied the defendants' directed verdict and j.n.o.v. motions.

## C. *Breach of Contract*

Defendants' next attack on the jury's verdict focusses on the sufficiency of the evidence to sustain Biggins' claim that the defendants breached a contract embodied in the Hazen Paper Company's 1980 Employee Handbook. The jury found that either an express or implied employment contract existed between Biggins and the Hazen Paper Company. It also found that the Employee Handbook constituted a part of this contract and that this contract was breached at the time of Biggins' termination. The jury awarded compensatory damages of $266,897. The district court subsequently denied directed verdict and j.n.o.v. motions that challenged both the sufficiency of the evidence establishing the existence of a contract other than at-will employment and the sufficiency of proof of damages flowing from the breach of that contract.

■ The parties agree that the controlling authority under Massachusetts law is *Jackson v. Action for Boston Community*

---

8. We think that *Davis v. Sweetheart Plastics, Inc.,* 635 F.Supp. 849 (D.Mass.1986), does not properly characterize the principle of detrimental reliance. Appellants urge that we apply the *Davis* court's reasoning that detrimental reliance cannot be established where the defendant fails to adduce evidence that "concrete job offers were made or interviews held." *Id.* at 850. The appellants read this case as holding that a plaintiff who remains in his job on account of his employer's false promise of future benefits, without taking any steps to secure al-

ternative employment, is thereby barred from asserting detrimental reliance. This cannot be correct. When an employer wishes to secure an employee's continued service through false promises of benefits, it is his precise intention to deter the employee from seeking alternative employment. To apply the *Davis* court's rationale would be to accept the perverse proposition that only those employees who see through their employers' fraudulent promises of benefits—and therefore take steps to find alternative employment—can ever show detrimental reliance.

*Development, Inc.,* 403 Mass. 8, 525 N.E.2d 411 (1988). In *Jackson,* the Massachusetts Supreme Judicial Court established that the existence of an express or implied employment contract was a factual issue to be determined under the circumstances of the case, 525 N.E.2d at 413–14, and that, "on proper proof, a personnel manual can be shown to form the basis of [such] an express or implied contract." *Id.* 525 N.E.2d at 414. In *Jackson,* however, the Supreme Judicial Court found summary judgment appropriate against the plaintiff alleging breach of a contract embodied in an employment manual:

> In this case, ... the most that can be said in his behalf is that he received the manual at some unknown time and continued to work for the defendant thereafter....
>
> ....
>
> [O]n review of all the circumstances here, ... the conclusion is inexorable that no implied contract based on the personnel manual's terms existed. It is undisputed that the defendant retained the right to modify unilaterally the personnel manual's terms. This tends to show that any "offer" made by the defendant in distributing the manual was illusory. The personnel manual's language that it is provided for "guidance" as to the defendant's "policies" is of the same import. It is also significant that nothing in the circumstances here reveals any negotiation over the terms of the personnel manual. Furthermore, consistent with employment at will, no term of employment was stated in the personnel manual. The plaintiff does not argue that any special attention was called to the manual by the defendant; there is no indication that the plaintiff signed the manual, or in any way manifested his assent to it or acknowledged that he understood its terms.

*Id.* 525 N.E.2d at 415–16 (citations omitted). This means, as we understand it, that an employer does not automatically enter into a contract other than at-will employment with its employees by merely distributing a personnel manual to them. Instead, *Jackson* requires that a plaintiff establish all of the elements ordinarily necessary for the formation of a contract in order to prove that a personnel manual forms the basis of an express or implied employment contract.

The evidence showed that Biggins was hired by Hazen Paper in 1977. Biggins testified that at some point thereafter he acquired a copy of the company's 1980 Employee Handbook. Biggins stated that he tried to take a vacation in May of 1986, a month prior to his discharge from the company, but was refused permission by Thomas Hazen. He testified that after his termination the company refused to pay him for other accrued vacation time. Biggins said that he understood that the company had a policy of not paying employees for vacation time off, and that he learned of this policy from the 1980 Employee Handbook. He also declared that he had learned about this policy from a letter sent him after his termination by Hazen Paper's attorney, in which Biggins thought the attorney had quoted "verbatim" those portions of the Employee Handbook that described Hazen Paper's vacation policy.

The 1980 Employee Handbook established other personnel policies apart from the vacation policy. As part of a section entitled "The Policies You Enjoy as an Employee of Hazen Paper Company," the Handbook specified that employees would have to pass through a ninety day "get-acquainted period" in order to become "regular" employees. In a subsection titled "Job Security," the Handbook provided that

> When employees do not fulfill the Company's standards, they are counselled and told how to be an acceptable employee. Only those who jeopardize customer relations through outlandish gross violations of standards or failure to respond to repeated counselling are separated.

On the topic of discipline of employees, the Handbook had a section entitled "What is expected of you as an employee of Hazen Paper Company," which provided that

> When discipline becomes necessary because of a violation of Hazen Paper Company's rules, we have the responsibility to ensure that such discipline is fair and

consistent. To provide for this treatment, the following factors will be considered:

1) The seriousness of the offense;

2) The circumstances surrounding the incident;

3) Your past record;

4) The Company's past practice.

Generally, any discipline will start with a verbal warning, then a more serious penalty of suspension or discharge if the conduct does not change. For very serious matters, employees may be discharged without warning.

These policies, and the surrounding circumstances of Biggins' termination, formed the basis of the jury's finding that (1) the 1980 Employee Handbook established a contract between Hazen Paper and Biggins of other than at-will employment, and (2) that Biggins' termination in 1986 breached the contract embodied in the Handbook because the company failed to follow the procedures specified in the Handbook governing employee counselling and "discipline."

Viewing the evidence in the light most favorable to Biggins, we are nonetheless compelled to hold that the district court erred in denying the defendants' motion for j.n.o.v. After reviewing the various principles of contract formation specifically enumerated by the *Jackson* court as being necessary to establish the existence of a contract other than at-will employment, we find the evidence lacking in two important respects.

First, in affirming a grant of summary judgment against an employee, *Jackson* held that it was "significant that nothing in the circumstances here reveal[ed] any negotiation over the terms of the personnel manual." *Jackson*, 525 N.E.2d at 415. In this case, there was no evidence to support a finding that there was "negotiation" between Biggins and Hazen Paper which in any way implied that the 1980 Employee Handbook ever formed a part of Biggins' conditions of employment between 1977 and his termination in June of 1986. In-

deed, the evidence showed that the only time the terms of the 1980 Employee Handbook were discussed with Biggins was *after* his discharge from the company. Biggins argues that such "negotiations" took place in the context of the 1984 promise of stock compensation, but offered no evidence at trial that the Employee Handbook was mentioned by him or Thomas Hazen during that meeting.

Second, there was no showing that prior to Biggins' termination that "special attention was called to the manual by the defendant ... [and] no indication that the plaintiff signed the manual, or in any way manifested his assent to it or acknowledged that he understood its terms." *Jackson*, 525 N.E.2d at 416. In this respect, the fact that the Employee Handbook relied upon by Biggins was issued by his employer three years after he joined Hazen Paper in 1977 helps explain why Biggins was unable to offer evidence showing that he was called upon to sign the Handbook or otherwise manifest assent to its terms. There was simply no evidence upon which the jury could have made the determination that prior to Biggins' discharge "special attention was called" to him by Hazen Paper about the 1980 Employee Handbook.

The most that can be said here is that after Biggins' termination, Hazen Paper refused to pay him for his accrued vacation time on the basis of language in the Employee Handbook. Biggins, in turn, attempted to hold the defendants to the standards of behavior provided in other portions of that manual. We do not think that under Massachusetts law a jury would be permitted to find that the 1980 Employee Handbook established an implied or express contract of other than at-will employment with Biggins. Consequently, since such an employment contract did not exist at the time of Biggins' termination, there could have been no breach.

Even if we concede that Biggins satisfied some of the elements of contract formation required by *Jackson*,[9] we think that his

---

9. The evidence is inconclusive, at best, to establish some of the other elements required by the *Jackson* court. For example, in rejecting the

plaintiff's claim of an implied contract, the Supreme Judicial Court placed particular reliance on the fact that the defendant expressly retained

failure to adduce evidence to support at least two of the principal elements of that inquiry was fatal to his claim. Under these circumstances, the district court was required to grant j.n.o.v. Where there was no employment contract other than at-will established or implied under the 1980 personnel manual, the jury's award of damages must be vacated.

### D. *Massachusetts Civil Rights Act*

■ On cross-appeal, Biggins challenges the district court's grant of j.n.o.v. reversing the jury's award of one dollar in compensatory damages for violation of the Massachusetts Civil Rights Act. Mass. Gen.L. ch. 12, §§ 11H & 11I.[10] To recover under these provisions, a plaintiff must prove that

> (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by "threats, intimidation or coercion."

*Bally v. Northeastern Univ.*, 403 Mass. 713, 532 N.E.2d 49, 51–52 (1989) (quoting Mass.Gen.L. ch. 12, § 11H). Applying this test to Biggins' claim, the district court conceded that there might have been an interference with "rights" within the meaning of the Civil Rights Act as a result of the failure of Hazen Paper to deliver the promised stock compensation. The court nonetheless concluded that Biggins had failed to offer adequate evidence to support a claim under the Civil Rights Act because he had not demonstrated that the defendants used *physical* "threats, intimidation or coercion" to accomplish this deprivation.

On appeal, Biggins insists that the district court too narrowly construed the meaning of "threats, intimidation or coercion" when it found Biggins' case distinguishable from "most [Civil Rights Act] cases recognized by the Supreme Judicial Court [which] involve the threat of physical contact." Biggins argues that the district court erred because it required proof of a threat of physical harm.

In *Bally*, the Massachusetts Supreme Judicial Court noted that almost all of the cases in which it had granted relief under the Civil Rights Act involved "a physical confrontation accompanied by a threat of harm." *Id.* 532 N.E.2d at 52. The *Bally* court acknowledged that it thought the sole exception to this requirement of physical confrontation as an element of a Civil Rights Act claim was *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93,

---

the right to modify unilaterally the personnel manual's terms. *Jackson*, 525 N.E.2d at 415. In the instant case, there was no comparable reservation of rights. Biggins concludes that the absence of a reservation of rights of modification is proof in its favor of an implied contract. The defendants naturally take the opposite view that there "was no evidence that Hazen Paper ever gave up the right to modify its own personnel policies."

The *Jackson* court offered no bright-line standards as to how "clear an indication an employer must give in connection with distributing an employee manual before it may be found that the employer entered into a contact on other than a strictly at-will basis." *Id. Jackson* nonetheless places the burden on the employee to prove the existence of the formation of a contract. In this case, there was no express reservation of a right of modification by Hazen Paper. We think that Massachusetts courts would probably not consider the mere fact of the absence of such a reservation adequate evidence to support an employee's claim of the formation of a contract other than at-will employment. We also note that we have previously resolved in favor of the employer ambiguities created by the silence of an employment manual on the issue of whether that manual constitutes part of an employment contract. *See Menard,* 848 F.2d at 289–90 (pre-*Jackson* decision under Massachusetts law affirming summary judgment against employee on implied contract claim where there was no evidence showing that personnel manual applied to that employee).

10. Mass.Gen.L. ch. 12, § 11H provides in pertinent part that

> Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or ... commonwealth, the attorney general may bring a civil action....

Mass.Gen.L. ch. 12, § 11I creates a private right of action for persons whose rights have been "interfered with" in the manner proscribed by section 11H.

502 N.E.2d 1375 (1987). There, according to the *Bally* court, in a case involving the deprivation of the plaintiff's contract rights, the Supreme Judicial Court found "that the Boston Symphony Orchestra violated [the Civil Rights Act] because its cancellation of its contract with Redgrave had the effect, intended or otherwise, desired or not, of coercing Redgrave not to exercise her First Amendment rights." *Id.* 532 N.E.2d at 52. Biggins asserts that his case is analogous to *Redgrave,* insofar as he too suffered a deprivation of his contractual rights to his stock compensation as a result of the nonphysical form of "intimidation" to which he was subjected at the time of his termination from Hazen Paper.

We agree with the district court that j.n.o.v. was appropriate. In the *Redgrave* decision, the Supreme Judicial Court found that a deprivation of Redgrave's contract rights could have been caused by "threats, intimidation and coercion"—specifically, threats to the safety of the audience and members of the Boston Symphony Orchestra made by community members and subscribers after the announcement of Redgrave's planned performance. *See Redgrave,* 502 N.E.2d at 1376–79. The *Redgrave* court found that physical threats by these third parties could have caused the BSO to cancel Redgrave's performance contract, depriving her of both her contract and First Amendment rights. *Id.* The *Redgrave* court thereby inferred the existence of physical "threats, intimidation, or coercion" sufficient to state a claim under the Civil Rights Act.

Biggins did not offer evidence that showed that, as in *Redgrave,* the deprivation of his contract or constitutional rights was caused by indirect physical "threats, intimidation or coercion." We therefore see little reason to deviate from the Supreme Judicial Court's repeated pronouncement that a defendant can be held liable under the Civil Rights Act only in situations that "involve[ ] an actual or potential physical confrontation accompanied by a threat of harm." *Layne v. Superintendent, Massachusetts Correctional Inst.,* 406

Mass. 156, 546 N.E.2d 166, 168 (1989) (citing *Bally*). *See also Willitts v. Roman Catholic Archbishop,* 411 Mass. 202, 210, 581 N.E.2d 475, 480 (1991) ("relief under the Act may be granted where the 'threat, intimidation or coercion' involves ... a physical confrontation accompanied by a threat of harm....") (citations omitted); *Longval v. Commissioner of Correction,* 404 Mass. 325, 535 N.E.2d 588, 593 (1989) (same principle). If *Redgrave* states an exception to this principle, that exception is not applicable under the facts of this case. We therefore affirm the district court's grant of j.n.o.v.; the jury's one dollar damages award is annulled.

## V. PREJUDGMENT INTEREST

■ The district court awarded prejudgment interest "on the entire award." In *Powers v. Grinnell Corp.,* 915 F.2d 34 (1st Cir.1990), the role of prejudgment interest was fully explored where liquidated damages had been awarded on an ADEA claim and there had been recovery on state law claims paralleling the ADEA claim.[11] We focused on whether the ruling in *Thurston* that liquidated damages under ADEA was punitive, 469 U.S. at 125, should change our circuit rule "that an award of liquidated damages bars prejudgment interest in ADEA cases." *Kolb v. Goldring, Inc.,* 694 F.2d 869, 875 (1st Cir.1982). After a detailed examination and analysis of *Thurston* and cases in other circuits, we concluded "that *Thurston* does not ordain abandonment of the majority rule that an award of liquidated damages under the ADEA precludes a recovery of prejudgment interest on the back pay award." *Powers,* 915 F.2d at 41 (citations omitted). We also held, following *Kolb* and *Linn v. Andover Newton Theological School, Inc.,* 874 F.2d 1, 8 (1st Cir.1989), that a plaintiff cannot recover both prejudgment interest on a back pay award under a state law claim and liquidated damages on an ADEA claim. *Powers,* 915 F.2d at 42. We are, of course, bound by the *Powers* holding. Therefore there can be no prejudgment interest on the ADEA damages award.

---

**11.** The state law claims were brought under the     Rhode Island Fair Employment Practices Act.

Although *Powers* would also preclude prejudgment interest on the state law claim of breach of the employment contract, our reversal of the district court's ruling on that claim and annulment of the damages renders this issue moot.

The state law claim based on fraud, however, stands on a different footing. This was not a claim for the back pay and lost employment benefits encompassed within the ADEA count. The fraud count in the complaint was premised on a promise by the defendants that "they would pay him [plaintiff] in addition to his regular salary corporate stock of a value which would increase his annual compensation to $100,-000." The jury was instructed properly on each count of the complaint. The only instruction that referred directly to the stock promise was on the fraud count: "The next count is fraud or deceit. Plaintiff also alleges that Defendants committed fraud or deceit by promising to give Plaintiff stock but never delivering the stock." The court then went on to instruct the jury carefully and properly on the proof necessary for a finding of fraud under Massachusetts common law. The jury was further instructed not to award duplicative damages: "In awarding damages, you should be careful not to award duplicative damages; that is, Plaintiff is entitled to collect full compensation for his injuries, but he must not collect more than once for the same wrong."

An analysis of the jury's awards on the fraud and ADEA counts shows that its award for fraud was not duplicative of its award on the ADEA count. The jury awarded plaintiff $315,000 on the fraud claim. The plaintiff's damages evidence on this count was that the stock loss amounted to $342,498. The jury award of $315,-000 was a rough approximation of the plaintiff's evidence. On the ADEA count, the jury awarded plaintiff $560,775. As already pointed out, this was $141,320.62 more than the plaintiff's losses in salary, employment benefits and bonus. It is, however, a far cry from the stock loss of $342,000.

■ We see no reason why prejudgment interest should not be allowed on a state law claim that is, as here, separate and distinct from the ADEA claim. This was well within the district court's discretion. *See Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1343 (1st Cir.1988). This result also comports with our decision in *Freeman* in other respects. There, we observed that "a plaintiff is entitled to only one full recovery, no matter how many legal grounds may support the verdict," *id.* at 1345, and that the "plaintiff, although entitled to the same damages under both federal and state statutes, could collect them but once." *Id.* at 1344, n. 7. *See also Linn,* 874 F.2d at 8. Here, the plaintiff has recovered the value of the stock promised him under his common law fraud claim, and not under his ADEA claim. There is, therefore, no duplication of damages.

■ We now turn to the ERISA damages award. We have been unable to find any cases discussing whether or how an award of liquidated damages under an ADEA claim affects the addition of prejudgment interest to ERISA damages. We do know, however, that "[a]s a matter of federal law, prejudgment interest is a discretionary item of compensation." *Conway v. Electro Switch Corp.,* 825 F.2d 593, 602 (1st Cir.1987). *See also Kolb,* 694 F.2d at 875.

In *West Virginia v. United States,* 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), the question was whether West Virginia was liable for prejudgment interest on a debt owed the United States Army Corps of Engineers. *Id.* at 306, 107 S.Ct. at 704. A unanimous court found that it was. In the course of its opinion, the Court stated: "Prejudgment interest is an element of complete compensation...." *Id.* at 310, 107 S.Ct. at 706 (citing *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655–656, & n. 10, 103 S.Ct. 2058, 2062–2063, & n. 10, 76 L.Ed.2d 211 (1983)). The Seventh Circuit has taken the position that prejudgment interest should be presumptively available to victims of federal law violations and that this presumption is spe-

cifically applicable to ERISA cases. *See Rivera v. Benefit Trust Life Ins. Co.*, 921 F.2d 692, 696 (7th Cir.1991). We need not go that far at this time. The question is whether the prejudgment interest award was within the discretion of the district court. We find that it was.

As with the state law fraud claim, the ERISA award did not duplicate the ADEA award. It was not based on loss of back pay and other employment benefits due and owing at the time plaintiff was discharged. In awarding damages on the ERISA count, the jury found that "defendants fired plaintiff for the purpose of preventing plaintiff from attaining vestment of pension benefits, in violation of ERISA." We have already found that the jury verdict on this count had a solid evidentiary foundation. Defendants argue that because the pension rights would not be payable until 1994, prejudgment interest cannot be awarded. This overlooks the obvious fact that the plaintiff has been damaged now because defendants took away pension benefits by firing him before his rights to the pension could vest. We affirm the award of prejudgment interest on the ERISA damages.

## VI. ATTORNEY'S FEES

After trial, Biggins moved that he be awarded attorney's fees under the ADEA count, the ERISA count, and the Massachusetts Civil Rights Act count in the amount of $666,729.12. This amount represented one-third of the total jury verdict of $2,000,187.35. In its memorandum opinion and order on the post-trial motion, the district court reduced the ADEA award by one-half and found, as a matter of law, that plaintiff was not entitled to liquidated damages. It seems apparent that, regardless of the numbers, plaintiff sought an enhancement of attorney's fees equal to one-third of the final judgment on damages. This is borne out by an affidavit of plaintiff's counsel submitted in support of its motion for attorney's fees.

This affidavit stated, *inter alia,* that the case was handled on a one-third contingent fee basis with the plaintiff responsible for the expenses incurred; and that in the legal market for the geographic area in which plaintiff's counsel practices—Springfield, Massachusetts—a one-third contingent fee agreement is the typical method of compensation for attorneys representing plaintiffs on employment-related litigation.[12] The chief counsel for the plaintiff stated:

I agreed to accept this case on a contingent fee basis, even with the knowledge that this would be a long and complicated case, because I knew this was the only way to provide access to the Courts for Mr. Biggins, and because our risk taking had the potential for reward if successful with a premium in excess of our normal hourly rates. If the Court's award of attorneys' fees is limited to payment for hours expended multiplied by our normal hourly rates, then I would be discouraged from taking these types of cases in the future when I could be spending my time on cases where I would be paid without risk of non-payment according to my normal hourly rate.

Plaintiff's counsel also submitted detailed records of the time spent by the attorneys and paralegals on the case and a fee computation based on this and the hourly rates charged by the different attorneys who worked on the case. The total legal fees, as determined by the time expended multiplied by hourly rates, came to $182,058.25. The district court adjusted this fee slightly to reduce the hourly payment rates on work performed by experienced attorneys on "non-core" matters. The court arrived at a lodestar fee in the amount of $175,564.57. Biggins does not appeal the court's determination of the lodestar fee award.

The district court refused, however, to enhance the lodestar fee award to an amount equivalent to one-third of the total damages awarded. Plaintiff appeals

---

**12.** There were affidavits by two other attorneys from the same legal market area to the same effect.

the refusal of his request for enhancement of the fee award.

The issue of enhancement of legal fees to reflect the contingency of services—the risk involved of not getting paid—was the focus of the Supreme Court's decision in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). In a comment that is pertinent to the case before us, Justice White, writing for a plurality, observed that fee enhancement is not necessary "where any plaintiff, impecunious or otherwise, has a damages case that competent lawyers would take in the absence of fee-shifting statutes." *Id.* at 726, 107 S.Ct. at 3087. Justice White then stated:

> The issue thus involves damages cases that lawyers would not take, not because they are too risky (the fee-shifting statutes should not encourage such suits to be brought), but because the damages likely to be recovered are not sufficient to provide adequate compensation to counsel, as well as those frequent cases in which the goal is to secure injunctive relief to the exclusion of any claim for damages. In both situations, the fee-shifting statutes guarantee reasonable payment for the time and effort expended if the case is won.

*Id.*

It appears to us that in this case fee enhancement is not warranted. Although the fee contract between plaintiff and his attorneys is not part of the record, it can be fairly inferred from counsel's affidavit that Biggins and his attorneys entered into a fee agreement whereby Biggins agreed to pay his attorneys one-third of the amount of damages awarded and be responsible for expenses. In his affidavit, chief counsel for Biggins stated that "our risk taking had the potential for reward if successful with a premium in excess of our normal hourly rates." On the basis of the adjustment in damages made in this opinion, and without adding prejudgment interest, plaintiff's attorneys are entitled to fees under their contingent fee arrangement of more than twice the amount of the lodestar fee

award. Plaintiff's counsel, as he anticipated, will in fact be rewarded with a premium in excess of his normal hourly rates.

The substantial recovery of damages in this case stands in contrast to the situation in a majority of civil rights cases in which the damages are so low that fees based on a contingent fee agreement are less than the lodestar recoverable as attorney's fees. In *Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), the damages award on a § 1983 claim totalled $10,000. The attorneys had a forty percent contingency fee agreement with the plaintiff. The lodestar figure, as determined by the district court, was $7,500. The court of appeals set the fee award aside on the ground that the contingent fee agreement was a cap on the fees to be awarded. Justice White, writing for the Court, reversed this ruling, holding that "[t]he attorney's fee provided for in a contingent-fee agreement is not a ceiling upon the fees recoverable under section 1988." *Id.* at 96, 109 S.Ct. at 946. *Blanchard,* which is typical of the fee cases coming before the courts, is the reverse of the case before us. Under the circumstances of this case, fee enhancement is not necessary because the contingency arrangement more than adequately compensates Biggins' attorneys for the risk undertaken in accepting this case.

This does not mean that a lodestar fee should not be determined. The lodestar fee, which is paid by the defendant, acts as a deterrent to future violations of the ADEA. As the *Blanchard* Court pointed out, "[t]he defendant is not, however, required to pay the amount called for in a contingent fee contract if it is more than a reasonable fee calculated in the usual way." *Id.* 109 S.Ct. at 944. We would expect, of course, that the lodestar fee as determined by the district court will be an offset against the fee to be paid by the plaintiff under the one-third contingent fee agreement.

## CONCLUSION

1. We uphold the finding of liability on the ADEA count. We find, as a matter of law, that the violation was willful. The damages are reduced from $560,775 to $419,454.38. Because this

was a willful violation that amount is doubled to $838,908.76.

2. We uphold the finding of liability on the ERISA count. We order a remittitur of $7,000 on the damages award of $100,000.

3. We uphold the finding of liability on the wrongful discharge count. We leave undisturbed the award of one dollar in damages.

4. We uphold the finding of liability on the fraud count and affirm the damages award of $315,098.

5. We reverse the finding of liability on the breach of employment contract count. The damages award on that count of $266,897 is annulled.

6. We affirm the district court's grant of j.n.o.v. on the Massachusetts Civil Rights Act count. This means the jury award of one dollar in damages is annulled.

7. No prejudgment interest can be awarded on the ADEA count. We uphold the awards of prejudgment interest on the ERISA count and the wrongful discharge and fraud counts.

8. We affirm the district court's refusal to enhance plaintiff's attorney's fees.

Affirmed in part, reversed in part. Remanded for further proceedings consistent herewith.

No costs to either party.